[No. S004525. Crim. No. 23117. May 1, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS LUJAN BONILLAS, Defendant and Appellant.

758

**COUNSEL**

John M. Bishop, under appointment by the Supreme Court, and Dennis A. Fischer for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John W. Carney, Robert M. Foster, Steven H. Zeigen, Michael D. Wellington and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—Defendant Louis Lujan Bonillas was sentenced to death under the 1978 death penalty law (Pen. Code, § 190 et seq.)[1] upon convictions of murder and burglary with a finding of a burglary felony-murder special circumstance. This appeal is automatic.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

We conclude that the judgment should be affirmed in all respects except that the judgment of death should be vacated and the cause remanded for reconsideration of the automatic application for modification of the death verdict (§ 190.4, subd. (e)), and for sentencing on the burglary count.

## FACTS

### 1. *The Offense*

The guilt phase evidence was largely uncontested, and was based primarily on defendant's videotaped reenactment of the crime.

Defendant was, at the time of the offense, staying at his parents' home. The victim, Linda Martinez, lived next door with her husband and two children.

On the morning of Tuesday, September 8, 1981,[2] defendant intended to steal something from the Martinez residence. Defendant climbed over the fence between the two houses, removed a screen from a window and climbed into the Martinez home. He wandered from room to room, looking for something to steal. He found a television set in the living room, but it was too large to carry.

Through the front window, defendant saw Linda Martinez arrive home in her car. Instead of escaping through the window he had entered, defendant ran to the baby's bedroom and hid in the closet. He left the closet door slightly ajar so he could see out.

Martinez came into the bedroom and placed her baby in the crib. Martinez left the room, but came back when the baby began to cry. She placed the baby in a baby swing near the living room. Defendant heard the telephone ring, and he attempted to leave. He came out of the closet, but he saw Martinez hang up the telephone, so he ran back and hid in the closet again. Martinez began running the vacuum cleaner in the baby's room. The clothes rack in the closet where defendant was hiding fell down. Martinez heard the noise, opened the closet door and saw defendant.

Defendant stated he tried to get up and run out, but Martinez held onto him. She grabbed a glass jar of cotton swabs as she struggled with him. Defendant stated he was trying to get away, but they wrestled to the floor. He got the jar of swabs away from Martinez and hit her on the back of the

---

[2] In 1981, the Labor Day holiday fell on Monday, September 7. This offense took place on the day immediately following the holiday weekend, Tuesday, September 8.

head with the jar as she was on her hands and knees trying to get up. After defendant hit her, she did not move any more.

Martinez was unconscious and no longer struggling. Defendant nevertheless tore the cloth belt from Martinez's dress, wound it tightly around her neck, and knotted it twice. Defendant stated that he ripped off the victim's underwear, and then he left and returned home over the fence. Defendant denied sexually assaulting Martinez and he also denied removing any jewelry from her person.

Defendant denied that he had been drinking that morning, but he stated that he had smoked one PCP cigarette and three marijuana cigarettes. Defendant stated he had acted alone and that no one had been with him.

The victim's husband discovered the body when he returned home from work that afternoon. The victim was lying face down on the floor in the baby's room. Martinez's wedding ring, which she always wore, and a gold watch she had given to her husband were missing. Martinez's husband also believed Martinez's wristwatch and a camera were missing, but he was not certain.

Dr. Irving Root performed an autopsy on the victim. He determined that death was caused by asphyxia resulting from ligature strangulation. The ligature appeared to be a cloth belt torn from the victim's dress. Martinez had also suffered three or four injuries to the back of the head. Some glass fragments were found in her hair. Martinez had also received a hard blow to the face. The head injuries and blows could have caused unconsciousness, but were not fatal. There were also extensive injuries in the vaginal and anal area. A recent episiotomy (Martinez's baby had been born only five weeks before the killing) had been torn open. These injuries occurred before death. Dr. Root opined that it would have taken some "fairly extensive blunt force," "more likely than not" the insertion of a broom handle or similar object, to have caused the tearing injuries he observed. Dr. Root testified it was possible, although "highly unlikely," that a kick could have caused the injuries to the genital and anal area.

Defendant presented no evidence in his defense at the guilt phase.

2. *Procedural Facts*

The procedural facts are particularly significant with respect to the primary issue in the case; i.e., whether the jury properly made an express finding of the degree of the murder.

Defendant was charged by amended information with the murder of Linda Martinez (§ 187), burglary of the Martinez residence (§ 459), penetration of the victim's vagina with a foreign object (§ 289, subd. (a)) and penetration of the victim's anus with a foreign object (§ 289, subd. (a)). A special circumstance of murder in the commission of a burglary was alleged (§ 190.2, subd. (a)(17)).

Trial was to a jury. Defendant's motion for judgment of acquittal pursuant to section 1118.1 was granted with respect to the vaginal and anal penetration charges. On January 27, 1983, a Thursday, the jury returned verdicts finding defendant guilty of murder as charged in the information and finding the burglary-murder special circumstance true. Defendant was also found guilty of the burglary.

Because there were to be further proceedings in the case, the court, after receiving these verdicts, admonished the jurors not to discuss the case among themselves or with anyone, and to refrain from reading anything about the case in the newspapers. The jury was then excused and the jurors were ordered to call in on February 2 to receive instructions on when to reconvene for the penalty phase.

Apparently on the following day, Friday, January 28, defense counsel brought to the court's attention that the guilty verdict on the murder charge had failed expressly to specify the degree of murder. On the next court day, Monday, January 31, 1983, the court ordered the jury to reassemble in advance of the date scheduled for penalty phase proceedings. Defendant moved to have the court fix the degree of the murder as second degree pursuant to section 1157.[3] The court denied the motion, and, instead, instructed the jury to retire and consider the question of the degree of the murder. For that purpose the court provided the jury with two verdict forms, one finding the murder to be in the first degree and the other finding the murder to be in the second degree. Within minutes the jury returned a verdict finding the murder to be murder in the first degree.

## GUILT PHASE ISSUES

### Finding of Degree of Murder

Defendant argues that this case is controlled by section 1157, which specifies the appropriate procedure when a jury *fails to find* the degree of a

---

[3] Section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

crime divided into degrees. (See fn. 3, *ante*.) ▮ However, the jury here *did expressly find* the degree of the murder in its January 31 verdict, so the question presented is whether the January 31 verdict was lawful. We hold it was.

In the first instance, the jury was instructed that if it found defendant guilty of murder it was required to find the degree of the murder. However, for some unknown reason it was not furnished a verdict form by which to specify the degree, and the guilty verdict it did return on January 27 specified only that defendant was guilty of murder "as charged in the information." Because the instructions required the jury to specify the degree of the murder and the verdict returned failed to do so, the verdict was incomplete under the law and the instructions.[4] (*People v. Scott* (1960) 53 Cal.2d 558, 561-562 [2 Cal.Rptr. 274, 348 P.2d 882]; *People v. Schroeder* (1979) 96 Cal.App.3d 730, 734-735 [158 Cal.Rptr. 220]; cf. *People v. Galuppo* (1947) 81 Cal.App.2d 843, 850-851 [185 P.2d 335].)

There is no question that, had the court noted the omission at once and required the jury to retire at that time to complete its verdict, the verdict fixing the degree of the murder would have been lawful. Section 1161 provides in pertinent part: "When there is a verdict of conviction, in which it appears to the Court that the jury may have mistaken the law, the Court may explain the reason for that opinion and direct the jury to reconsider their verdict . . . ." There are numerous decisions applying this principle to jury verdicts incomplete or inconsistent with the court's instructions. (*People v. Scott, supra,* 53 Cal.2d 558, 561-562 [where evidence showed and jury instructed only on first degree robbery or innocence, trial court properly refused to accept verdicts contrary to law and instructions of second degree robbery, and ordered jury to resume further deliberations (citing § 1161)]; *People v. Schroeder, supra,* 96 Cal.App.3d 730, 734-735 [11 overt acts alleged on conspiracy count; jury failed to mark verdict finding as to

[4] The jury was instructed it should return a finding on the burglary-murder special circumstance only if it found defendant guilty of first degree murder, and, of course, it did return a verdict of true as to the burglary-murder special circumstance. While this would plainly indicate the jury did in fact conclude the murder was first degree, the decisions of this court have insisted on an express finding of the degree to satisfy section 1157, no matter how plain the implied finding. (*People v. Beamon* (1973) 8 Cal.3d 625, 629, fn. 2 [105 Cal.Rptr. 681, 504 P.2d 905]; accord, *People v. Marks* (1988) 45 Cal.3d 1335 [248 Cal.Rptr. 874, 756 P.2d 260]; *People v. McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]; see *People v. Campbell* (1870) 40 Cal. 129; but cf. *People v. Garcia* (1984) 36 Cal.3d 539, 555-556 [205 Cal.Rptr. 265, 684 P.2d 826] [failure to instruct on intent to kill with respect to special circumstances not prejudicial error where issue of intent to kill was resolved adversely to the defendant under other, proper instructions (*Cantrell-Thornton*)]; accord, *People v. Balderas* (1985) 41 Cal.3d 144, 198-199 [222 Cal.Rptr. 184, 711 P.2d 480]; *People v. Ramos* (1984) 37 Cal.3d 136, 146-147 [207 Cal.Rptr. 800, 689 P.2d 430]; see also *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

any one; at defendant's suggestion court polled jurors and determined they had agreed on overt act number 1; although omission from the verdict should be corrected by directing the jurors to reconsider it (citing § 1161), defendant could not complain of polling procedure he invited]; *People* v. *Crawford* (1953) 115 Cal.App.2d 838, 841-842 [252 P.2d 963] [guilt verdict on one offense required finding of not guilty of alternative offense; when jury returned verdicts in conflict or incomplete, court properly had jury retire to reconsider its verdicts (citing § 1161)]; *People* v. *Keating* (1981) 118 Cal.App.3d 172, 181-182 [173 Cal.Rptr. 286] [trial court properly ordered jury to reconsider inconsistent verdict consisting of both guilty and not guilty verdicts and both true and not true special allegation findings (citing § 1161)]; *People* v. *Mestas* (1967) 253 Cal.App.2d 780, 784-787 [61 Cal.Rptr. 731] [return of both guilty and not guilty verdicts was return of one inconsistent verdict only; court properly directed jury to retire and reconsider (citing § 1161)]; cf. *People* v. *Crawford* (1967) 253 Cal.App.2d 524, 538-539 [61 Cal.Rptr. 472] [when jury returned verdict of first degree robbery but mistakenly found armed finding not true, court properly directed jury to correct verdict]; *People* v. *Galuppo, supra,* 81 Cal.App.2d 843, 850-851 [when court discovered jury omitted to state degree of robbery, degree was properly fixed by show of hands and oral acknowledgment].)

The specific question presented is whether, under the circumstances here, the court was authorized to reconvene the jury on January 31 for the purpose of correcting the omission and completing its verdict by specifying the degree of the murder. We conclude it was.

In *People* v. *Hendricks* (1987) 43 Cal.3d 584, 597 [238 Cal.Rptr. 66, 737 P.2d 1350], this court recently spoke to the question of when a court is authorized to reconvene a jury. We stated: "In *People* v. *Thornton* (1984) 155 Cal.App.3d 845 [202 Cal.Rptr. 448], the Court of Appeal discussed the leading cases on the proper reconvening of a jury. (*People* v. *Romero* (1982) 31 Cal.3d 685 [183 Cal.Rptr. 663, 646 P.2d 824]; *People* v. *Lee Yune Chong* (1892) 94 Cal. 379 [29 P. 776]; *People* v. *Peavey* (1981) 126 Cal.App.3d 44 [178 Cal.Rptr. 520]; *People* v. *Ham* (1970) 7 Cal.App.3d 768 [86 Cal.Rptr. 906], overruled on other grounds in *People* v. *Compton* (1971) 6 Cal.3d 55 [98 Cal.Rptr. 217, 490 P.2d 537]; *People* v. *Grider* (1966) 246 Cal.App.2d 149 [54 Cal.Rptr. 497]; and *People* v. *Powell* (1950) 99 Cal.App.2d 178 [221 P.2d 117].) ■ From these cases it correctly derived the following principles: 'Once a "complete" verdict has been rendered per [Penal Code] section 1164 [i.e., a verdict that has been received and read by the clerk, acknowledged by the jury, and recorded] *and the jurors discharged,* the trial court has no jurisdiction to reconvene the jury regardless of whether or not

the jury is still under the court's control (*Peavey*).[5] *However, if a complete verdict has not been rendered* (*Powell, Ham*) *or if the verdict is otherwise irregular* (*Chong, Grider*), *jurisdiction to reconvene the jury depends on whether the jury has left the court's control. If it has, there is no jurisdiction* (*Chong, Grider*); *if it hasn't, the jury may be reconvened* (*Powell, Ham*).'" (Italics added. *People v. Hendricks, supra,* 43 Cal.3d at p. 597, quoting *People v. Thornton* (1984) 155 Cal.App.3d 845, 855 [202 Cal.Rptr. 448]; see also *People v. Romero* (1982) 31 Cal.3d 685 [183 Cal.Rptr. 663, 646 P.2d 824].)

We explained: "[O]nce the court loses control over the jurors, it is without jurisdiction to call them together again. The rule rests on two bases. First, in cases in which the jury renders a complete verdict, the rule is designed to protect the verdict as an operative fact. This court implied as much in *People v. Lee Yune Chong*: ' "With the assent of the jury to the verdict as recorded, their functions with respect to the case cease, and the trial is closed"; and "after the verdict is received *and the jury discharged,* . . . the control of the jury and of the court over such verdict is at an end. The court cannot alter it, nor can the jury be called to alter or amend it." ' (94 Cal. at p. 385.)" (Italics added. *People v. Hendricks, supra,* 43 Cal.3d at p. 597; accord, *People v. Romero, supra,* 31 Cal.3d 685, 692-693.)

The significance of a discharge of the jury was specifically pointed out both in *Lee Yune Chong* and *Thornton*. After being discharged the jurors are "beyond the control of the court, [have] thrown off their characters as jurors, and [are] free from any official obligation." (*People v. Lee Yune Chong* (1892) 94 Cal. 379, 384 [29 P. 776].) "*Regardless* of whether and why the discharge may be erroneous, it results in sending the jurors back to the outside world freed of all the admonitions that previously guarded their judgments from improper influences. Once freed, the jurors can properly discuss the case with the district attorney and the People's witnesses, they can read about it in the media and they can entertain 'facts' or opinions about it from any source. The essence of cases like *Grider* and *Chong*,[6] and

---

[5] Where it is clear both that the verdict is complete and that the jury has been discharged the court *has lost control* over the jury. Thus, the statement in *Thornton* that *Peavey* stands for the proposition that such a verdict may not be reconsidered "regardless of whether or not the jury had left the court's control" is problematic.

[6] *People v. Peavey* (1981) 126 Cal.App.3d 44 [178 Cal.Rptr. 520] should be included with *Grider, supra,* 246 Cal.App.2d 149, and *Lee Yune Chong* in this category.

In *Peavey,* the defendant was found guilty of murder in the second degree and a use allegation was found true. The verdict was read, acknowledged and recorded. The jury was discharged, and the court also indicated to the jurors that they were free to discuss the case. Before the jury left the box, a juror attempted to change her vote. The trial court properly determined that it no longer had jurisdiction over the verdict because the verdict was complete in every way and because it had already discharged the jury.

what distinguishes them from *Powell* and *Ham,* is the incalculable and irreversible effect of this loss of control." (*People* v. *Thornton, supra,* 155 Cal.App.3d 845, 856; see also *People* v. *Romero, supra,* 31 Cal.3d 685, at p. 692.)

In *Lee Yune Chong,* this court explicitly recognized the situation is different where the court has not discharged the jury, stating: "The language hereinbefore quoted, to the effect that the functions of a jury cease with their assent to the recorded verdict, must be construed, of course, as applying to a *final assent followed by a discharge.*" (Italics added. *People* v. *Lee Yune Chong, supra,* 94 Cal. 379, 385; see also *People* v. *Romero, supra,* 31 Cal.3d 685, at pp. 693, 694.) In criminal as well as civil cases "[i]t is the duty of a Court to look after the form and substance of a verdict, so as to prevent a doubtful or insufficient finding from passing into the records of the Court; for that purpose the Court can, *at any time while the jury are before it, and under its control,* see that it is amended in form so as to meet the requirements of the law." (Italics added. *People* v. *Jenkins* (1880) 56 Cal. 4, 7; *People* v. *Fisher* (1948) 86 Cal.App.2d 24, 31 [194 P.2d 116]; see *People* v. *Lee Yune Chong, supra,* 94 Cal. 379, 387; *People* v. *Grider* (1966)

---

Thus, although in *Peavey, supra,* 126 Cal.App.3d 44 (unlike *Grider, supra,* 246 Cal.App.2d 149, and *Lee Yune Chong, supra,* 94 Cal. 379, in which the jury actually left the box) the jury had not yet left the box, the case was one like *Grider* and *Lee Yune Chong,* in which the trial had effectively been completed and the jury discharged. In neither *Powell, supra,* 99 Cal.App.2d 178 nor *Ham, supra,* 7 Cal.App.3d 768, by contrast, had a complete verdict been rendered.

In *Grider,* the foreman inadvertently signed the wrong verdict form, thereby returning a verdict of second degree rather than first degree robbery. The jury acknowledged the mistaken verdict and was discharged. The error was not discovered until the jurors had begun leaving the courtroom and conversing with other persons. Upon learning of the mistake, the judge reconvened the jury for further deliberations, and a verdict finding the defendant guilty of first degree robbery was quickly returned. On appeal, the judgment of robbery in the first degree was ordered stricken. The court held that, under the circumstances of the case, the judicial process had come to a conclusion before the jury was reconvened, and the trial judge had therefore lost control over the jury. (*People* v. *Grider, supra,* 246 Cal.App.2d 149, 153.)

In *Lee Yune Chong, supra,* 94 Cal. 379, the defendant was accused of murder. The jury returned a verdict finding the defendant guilty and fixing the penalty at imprisonment for life. The verdict was announced and recorded, and the court discharged the jurors for the term. The jurors left the courtroom, and mingled with spectators and others. Some had conversations with third persons about the case. Within a few minutes, the court reconvened the jury, purporting to vacate the order discharging the jury. The court instructed the jury to amend its verdict by finding the degree of the crime and ordered the jury to retire for further deliberations. The jury soon returned a verdict finding the murder to be in the first degree. This court held that reassembling the jury was a nullity because the jury's functions with respect to the case had ceased when the verdict was accepted and they were discharged. When the jury was discharged, "they were beyond the control of the court, had thrown off their characters as jurors, and had mingled with their fellow-citizens, free from any official obligation." (*Id.,* at p. 384.)

246 Cal.App.2d 149, 153 [54 Cal.Rptr. 497]; *People* v. *Powell* (1950) 99 Cal.App.2d 178 [221 P.2d 117]. See also § 1404.)[7]

■■■ Where, as here, further proceedings are to take place, the jury has not been discharged, the jurors have been specifically instructed that they are still jurors in the case, they have been admonished not to discuss the case with anyone nor to permit anyone to discuss the case with them, and they have been directed not to read anything about the case, the jurors have not thrown off their character as jurors nor entered the outside world freed of the admonitions and obligations shielding their thought processes from outside influences. Clearly, the jury here remained within the court's control (see *People* v. *Lee Yune Chong, supra,* 94 Cal. 379, 384; *People* v. *Thornton, supra,* 155 Cal.App.3d 845, 856), their verdict was incomplete, and the court was authorized to reconvene the jury to complete its verdict.

Defendant contends, however, the instant case is like several other cases in which the jury's correction of its verdict to fix the degree of the crime was held improper.

In *People* v. *Hughes* (1959) 171 Cal.App.2d 362 [340 P.2d 679], the jury returned a verdict form finding the defendant guilty of murder "as charged." This was the form the jury had been instructed to utilize if they found the defendant guilty of first degree murder. The jury was polled and the verdict was recorded. The jury was then released and told to return the next day. The next morning, before the beginning of penalty phase proceedings, the trial court asked the foreman and the other jurors whether they had understood the verdict they returned to be a verdict of first degree murder. The jurors orally indicated that had been their intent and understanding. *Penalty phase evidence was then received.* Only when both sides had rested in the penalty phase did the court decide that the verdict specifying the murder was first degree murder had to be in writing. Thereupon, the court directed the jury to retire and deliberate further, and to return a supplemental verdict stating whether the murder was found to be of the first or second degree. The jury thereafter returned a supplemental verdict finding the murder was in the first degree.

The *Hughes* court considered the attempt to correct the guilt phase verdict improper as a resubmission to the jury of the issue of degree, in violation of a specific provision of former section 190.1 that " 'the issue of guilt shall not be retried by such [penalty phase] jury.' " (*People* v. *Hughes, supra,*

---

[7]Section 1404 provides: "Neither a departure from the form or mode prescribed by this Code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right."

171 Cal.App.2d 362, 370.) The court specifically pointed out that the "re-submission" occurred "after the jury had heard much evidence, inadmissible on that issue [guilt], and damaging to appellant. If, as the attorney general argues, we were to consider the verdict of 'guilty as charged' to have been formally defective and should further consider that the court was empowered to have the jury correct its verdict, *we would still be compelled to say that by reason of the way in which that was done the judgment would have to be reversed.*" (*People* v. *Hughes, supra,* 171 Cal.App.2d 362, 370, italics added.)

Having resolved the problem at hand the *Hughes* court, *supra,* 171 Cal.App.2d 362, nevertheless went on to state that after the original verdict had been received and the jury had been "released," the murder verdict was deemed to be for second degree murder only, because it was "complete" and, so far as the jury was concerned, that verdict had ended the trial on the issue of guilt. On the specific facts of the case, i.e., that the penalty phase trial had commenced and evidence admissible only at the penalty phase had been introduced, the court's statement was correct in substance. The guilt phase verdict was required to be treated as complete and the guilt portion of the trial ended when the jury began considering the penalty phase evidence, inadmissible at the guilt phase.

As a general proposition, however, the *Hughes* court's statement, *supra,* 171 Cal.App.2d 362, was erroneous. As this court took pains to explain in *Lee Yune Chong,* the notion that a verdict is "complete" or "that the functions of a jury cease with their assent to the recorded verdict, must be construed, of course, as applying to a *final assent followed by a discharge.*" (*People* v. *Lee Yune Chong, supra,* 94 Cal. 379, 385, italics added.) The "release" of the jury at the end of the day in *Hughes, supra,* 171 Cal.App.2d 362, did not act as a discharge. Further proceedings were contemplated in the case and the court retained jurisdiction and control over the jurors. It was, rather, the commencement of the penalty phase trial and the receipt of penalty phase evidence which had the *same effect* as a discharge: the "incalculable and irreversible" effect of exposing the jury to improper influences. Thus, the guilt phase ended when the penalty phase commenced, and it was thereafter too late to permit the jury to complete its guilt phase verdict.

Quite obviously the instant case is fundamentally distinguishable from *Hughes, supra,* 171 Cal.App.2d 362. Here the jury was reconvened at a time in advance of the time set for the penalty phase trial for the sole purpose of correcting the omission and completing its guilt verdict, and it had not received any penalty phase evidence.

Defendant also relies on *People* v. *McDonald, supra,* 37 Cal.3d 351. While not entirely unjustified, defendant's reliance on *McDonald* is nevertheless

unavailing. *McDonald* is not controlling because it did not consider or rule on the question presented here and appears to have been factually dissimilar in at least one and possibly two significant circumstances.

In *McDonald, supra,* 37 Cal.3d 351, the jury was instructed it must unanimously agree whether the defendant was guilty of murder in the first degree and also, if it found the defendant was guilty of murder in the first degree, it must determine whether the murder was committed while the defendant was engaged in or attempting to engage in a robbery. The jury returned a verdict finding the defendant guilty of murder "as charged in . . . the information" and found the robbery-murder special circumstance true. The jury was polled and the verdict was recorded in the minutes.

Three and a half weeks later, the jury was reassembled for the penalty phase. Before any proceedings were had on the penalty phase, the court advised the jury that the original verdict form had omitted to specify the degree of the murder. The court then submitted a new verdict form to the jury, adding the phrase, "and we further find it to be murder of the first degree, to be true/not true [*sic*]." The jury retired and deliberated for a short time before returning a supplemental verdict finding the murder was first degree.

The defendant contended in *McDonald, supra,* 37 Cal.3d 351, as defendant does here, that because the jury failed to specify the degree of the murder in its original verdict, the degree of the crime must be fixed at second degree by operation of law under section 1157. However, the argument of the People in *McDonald* was not that the jury's completing its verdict was proper but that a jury "finding" of first degree murder could be inferred from the jury's true finding on the special circumstance or that the verdict must necessarily have been for first degree murder because the jury was instructed solely on first degree murder. We rejected these "implied finding" contentions, holding that section 1157, as it had been construed in numerous cases, required the jury *expressly* to fix the degree of the murder.[8] (See fn. 4, *ante,* p. 769.)

Not only did the People in *McDonald* not argue that the court's attempt to have the jury complete its verdict was proper, it appears in *McDonald* the People conceded it was not. (See *People* v. *McDonald, supra,* 37 Cal.3d 351, 381, fn. 29.) Thus, the propriety of the attempt to complete the verdict was not placed in issue in *McDonald.* It is true that in the portion of the opinion discussing *People* v. *Hughes, supra,* 171 Cal.App.2d 362, there is some

---

[8] This basic holding from *McDonald* was recently reaffirmed in *People* v. *Marks, supra,* 45 Cal.3d 1335, in which we stated that section 1157 requires a jury expressly to specify the degree of the crime. (See also fn. 3, *ante,* p. 768.)

language in *McDonald* that appears to bear on the question, but that language failed to give recognition to the critical distinction between the situation in *McDonald* and the circumstances in *Hughes*: to wit, the tainting, by receipt of penalty phase evidence, of the further jury deliberations in *Hughes* attempting to complete the guilt verdict.

In addition, there is at least one critical factual distinction between *McDonald* and this case. While the jurors in *McDonald* were obviously not discharged, there is no indication that the jurors in that case were admonished, as the jurors were here, that they remained jurors and were not to discuss the case with anyone, etc. As opposed to only four days here, the jurors in *McDonald* were not reassembled for three and a half weeks during which time, in the absence of proper admonitions, they could have been exposed to impermissible outside influences.

In the instant case, the jury's correction and completion of its guilt phase verdict on January 31 was proper. The jury had not been discharged. Though the jury had been excused at the conclusion of proceedings on Thursday, January 27, the jury expressly remained under the control of the court. The court's admonitions ensured that the jury was not influenced by any outside source, nor was the jury improperly influenced by being exposed to penalty phase evidence. Indeed, in contrast to *McDonald, supra,* 37 Cal.3d 351, the jury did not undertake to correct its verdict at the outset of the penalty phase, but were reassembled to amend the guilt phase verdict even before penalty phase proceedings were scheduled to commence. Under these circumstances, we conclude that "the court was . . . justified in rectifying, and, indeed, in the performance of its duties was required to rectify" the jury's failure to properly complete its verdict to fix the degree of the crime and properly did so before the jury was discharged. (*People* v. *Powell, supra,* 99 Cal.App.2d 178, 182.)

Analysis of the other decisions cited in *McDonald, supra,* 37 Cal.3d 351, demonstrates that not a single one of them supports a contrary result. While those decisions do indicate that the jury's finding as to degree must be express, none dealt with a situation in which the jury corrected its oversight and completed its verdict while still under control of the trial court.

In *People* v. *Dixon* (1979) 24 Cal.3d 43 [154 Cal.Rptr. 236, 592 P.2d 752], the jury sent a note to the judge indicating it had agreed on a verdict of murder but was unable to agree unanimously that the murder was first degree, and inquired whether the jury must unanimously agree on second degree. The trial court instructed that the jury must unanimously agree on the degree. In response to the court's inquiry, the jury indicated it was not hopelessly deadlocked on the issue of degree and the court directed the jury

to retire for further deliberations. Thereafter the jury returned a verdict of first degree murder.

On appeal the defendant argued that section 1157 required reduction of the crime to second degree when the jury announced a deadlock. We held (1) there was no evidence the jury had deadlocked on the issue of degree, and (2) section 1157 applies where a jury *fails* to fix the degree (e.g., through inadvertence or lenience), but does not apply where the jury is *unable* to reach agreement. In any event, the *Dixon* jury, *supra,* 24 Cal.3d 43, was actually able to fix the degree.

*People* v. *Flores* (1974) 12 Cal.3d 85 [115 Cal.Rptr. 225, 524 P.2d 353] involved a prosecution for burglary. It was agreed the court would fix the degree of the burglary at the time of the probation hearing. The court inadvertently failed to fix the degree at that time or at any other time. Because the court failed to find the degree of the crime, the crime was deemed to be of the lesser degree pursuant to section 1157.

In *People* v. *Beamon, supra,* 8 Cal.3d 625, the defendant was convicted of robbery and the jury found an armed allegation to be true. The jury failed to fix the degree of the crime. Despite the jury finding on the armed allegation, we held that in the absence of a specific finding of the degree of the crime the conviction must be deemed to be of the second degree. In footnote 2 on page 629 we stated: "We cannot assume, contrary to the clear legislative direction, that because a factual finding was made which would have warranted a determination of first degree robbery, the jury unmistakably intended (see *People* v. *Flohr* (1939) 30 Cal.App.2d 576, 581 [86 P.2d 862]) to make that determination when it refrained from expressly fixing the degree."

In any event, no attempt was made in *Beamon, supra,* 8 Cal.3d 625, to have the jury correct its erroneous omission.

*People* v. *Thomas* (1978) 84 Cal.App.3d 281 [148 Cal.Rptr. 532] involved a conviction of robbery. The case was tried to the court, which found the defendant guilty of robbery and that the defendant used a firearm in the commission of the crime. The court failed specifically to find the degree of the robbery before passing sentence. By an ex parte order *after the sentencing hearing,* the court attempted to amend the sentence, fixing the degree of the robbery as first degree. The appellate court rejected the argument that the use finding could be used as an implied finding of degree.

The defendant in *People* v. *Baeske* (1976) 58 Cal.App.3d 775 [130 Cal.Rptr. 35] was convicted by a jury of robbery. The jury also found a use

allegation to be true but failed to specify the degree of the robbery. No attempt was made to have the jury correct its oversight. The judgment entered in the minutes was a conviction of second degree robbery, but the oral pronouncement of sentence was for first degree. It was held that the conviction was for second degree robbery.

In *People* v. *Doran* (1972) 24 Cal.App.3d 316 [100 Cal.Rptr. 886] the Court of Appeal had attempted to infer the degree of a robbery from an armed enhancement finding. On reconsidering the matter in light of *Beamon, supra,* 8 Cal.3d 625, however, the Court of Appeal held the conviction to be one for second degree robbery. (*People* v. *Doran* (1974) 36 Cal.App.3d 592 [111 Cal.Rptr. 793].) There was no attempt in *Doran* to have the jury correct its omission to find the degree.

*People* v. *Cox* (1973) 33 Cal.App.3d 378 [109 Cal.Rptr. 43] similarly involved the jury's failure to fix the degree in a robbery conviction although finding true an armed allegation. There was evidently no attempt to have the jury correct its omission, and the conviction was deemed to be of second degree robbery.

*People* v. *Fernandez* (1963) 222 Cal.App.2d 760 [35 Cal.Rptr. 370] involved a conviction of burglary in which evidently the jury failed to fix the degree. The trial court mistakenly found the burglary to be of the first degree and included in the judgment a statement that the defendant was armed with a deadly weapon although no such allegation had been included in the charge and it was not passed upon by the jury. The conviction was therefore held to be for second degree burglary only.

*In re Candelario* (1970) 3 Cal.3d 702 [91 Cal.Rptr. 497, 477 P.2d 729] did not involve trial of an offense divided into degrees at all. Rather, it concerned the effect of a trial court's attempt, after sentencing, to amend an abstract of judgment to include a finding as to a prior conviction. Although the defendant had admitted the prior at trial, the court's minutes and the abstract of judgment on which the defendant was sentenced failed to make a finding as to the prior. It was there held that the court's attempt to amend the abstract of judgment was ineffectual. In a dictum, the court stated that "Similar benefits accrue to the defendant when the trier of fact fails to specify the degree of a crime. In such circumstances, even on a plea of guilty, the crime is deemed to be of the lesser degree. (Pen. Code, §§ 1157 and 1192.)" (*In re Candelario, supra,* 3 Cal.3d 702, 706, fn. 2.)

In *People* v. *Campbell, supra,* 40 Cal. 129, the People argued that because the facts alleged in the indictment would support only a conviction of first degree and not second degree murder, the failure of the jury to specify the

degree did not require reversal. The court rejected the People's argument, holding that the statute required the jury expressly to declare the degree of the crime. There was no attempt in that case to have the jury correct its omission.

*People* v. *Johns* (1983) 145 Cal.App.3d 281 [193 Cal.Rptr. 182] was also a murder conviction in which, although the defendant was rather clearly charged and found guilty on a felony-murder theory, the jury failed to make an express finding as to the degree. Following *Beamon, supra,* 8 Cal.3d 625, the Court of Appeal held that in the absence of an express finding of degree, the conviction must be deemed to be of the second degree, though it felt obliged to add the comment that "Unfortunately, on this point, form triumphs over substance, and the law is traduced." (*Johns, supra,* 145 Cal.App.3d 281, 295.) There was no attempt in *Johns* to have the jury correct its omission.

None of these cases has any substantial relevance to the problem in this case or the problem that was inherent but not really considered in *McDonald, supra,* 37 Cal.3d 351. Although most construed section 1157 to require an express rather than an implied finding, none involved an incomplete verdict which was completed by a supplemental jury verdict expressly fixing the degree of the crime.

We conclude defendant's conviction of first degree murder was lawful and must be affirmed.

## SPECIAL CIRCUMSTANCE ISSUES

### 1. *Intent to Kill*

█ Defendant contends that the burglary-murder special circumstance required a finding of intent to kill. Defendant has not disputed that he was the actual killer, not an aider and abettor, in this case. In *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138 et seq. [240 Cal.Rptr. 585, 742 P.2d 1306], we held that an intent to kill need not be found if the defendant was the actual killer. (See § 190.2, subds. (a)(17) and (b).) Accordingly, we reject defendant's argument.

### 2. *Premeditation and Deliberation*

█ Defendant next contends that a finding of premeditation and deliberation was required to sustain the burglary-murder special circumstance. Defendant is mistaken.

Although the 1977 death penalty law provided for a special circumstance finding where the murder was "willful, deliberate, and premeditated" and was committed during the commission or attempted commission of five designated felonies, the 1978 death penalty law notably omitted such language from its felony-murder special-circumstance provisions. The deliberate omission of any reference to premeditation and deliberation from the felony-murder special-circumstance provisions of the 1978 law presumptively operated to change the law in that regard. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 467 [194 Cal.Rptr. 390, 668 P.2d 697]; see also *People* v. *Smith* (1983) 34 Cal.3d 251, 259 [193 Cal.Rptr. 692, 667 P.2d 149] [general rules of statutory construction apply to initiative measures adopted by vote of the people].)

As we held in *People* v. *Hamilton* (1988) 46 Cal.3d 123, 143 [249 Cal.Rptr. 320, 756 P.2d 1348], the burglary-murder special circumstance under the 1978 death penalty law (§ 190.2, subd. (a)(17)) does not require a finding of premeditation and deliberation.

Defendant further argues that imposition of the death penalty in the absence of a finding the murder was premeditated and deliberate is unconstitutionally arbitrary under the Eighth Amendment. ■ As this court held in *People* v. *Anderson, supra,* 43 Cal.3d 1104, at pages 1146-1147, the statutory scheme making felony murder but not simple murder death eligible does not violate the federal Constitution. Defendant's reliance on *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is misplaced. In that case, the United States Supreme Court held that the death penalty could not constitutionally be imposed on one "who neither took life, attempted to take life, nor intended to take life." (*Id.,* at p. 787 [73 L.Ed.2d at p. 1145].) Defendant here, however, was undisputedly the actual killer.

## PENALTY PHASE ISSUES

### Penalty Phase Evidence

The prosecution at the penalty phase rested on the evidence presented at the guilt phase.

Defendant presented extensive evidence in mitigation relating to the physical abuse he suffered as a child and his chronic drug use.

Dr. Muir, a neuropsychologist, obtained a childhood history from defendant which indicated his father often beat him and tied him up. Once, his

father tied defendant to a tree with a noose around his neck, choking him and bruising his neck.

The other significant feature of defendant's history was drug abuse, beginning with sniffing glue in junior high school, and including abuse of alcohol, amphetamines, marijuana and, more recently, PCP.

Dr. Muir administered some psychological tests and reviewed defendant's school testing records. Two of the tests indicated defendant had a memory deficit. The tests also showed defendant had trouble with abstract reasoning. Defendant's scores on verbal tests were low, but his scores on performance or nonverbal tests were nearly average.

Dr. Muir theorized that defendant was suffering from organic brain damage as a result of the beatings and other physical abuse he received as a child, including the choking incident, and as a result of his prolonged drug use. Dr. Muir's ultimate diagnosis was mild to moderate dementia (general intellectual deterioration) with a secondary diagnosis of substance abuse disorder.

Dr. Muir felt it was significant that defendant's recent drug use focused primarily on PCP. One effect of PCP is that it makes the user feel strong and invulnerable. Defendant used PCP to overcome anxiety caused by his psychological disabilities, but PCP also decreases the user's ability to control himself or to think clearly.

As related to the offense, it was Dr. Muir's opinion that defendant's psychological disabilities prevented him from rationally choosing a course of action. When the victim arrived home, defendant panicked. He could not escape, so he hid, with mounting anxiety. When the victim discovered him, he simply acted impulsively. Defendant's perception of the confrontation was like confrontations with his father in the past. Defendant perceived himself as the victim being attacked by a large aggressor. In addition to defendant's panic state, his PCP use added "increased emotionality, decreased awareness of [his] surroundings, [and] decreased ability to think rapidly . . . ." Dr. Muir opined that defendant was probably not aware of what he was doing during the commission of the offense.

Various members of defendant's family testified on his behalf, verifying the father's cruel treatment of defendant and the other children and corroborating defendant's drug use. In particular, several family members testified they saw defendant using PCP or saw him under the influence of drugs and alcohol over the Labor Day weekend, immediately preceding the offense.

Dr. Berman testified about the effects of PCP, particularly on chronic users: PCP distorts the user's perception of reality. Often, the user may feel that someone else is performing his or her actions and the user loses the capacity to appreciate the impact of his or her conduct. If the PCP user is in some danger, he or she is likely to perceive the danger in an exaggerated fashion and to react violently and aggressively. In chronic users, PCP builds up in the fatty tissues of the body. The residual PCP may be released into the bloodstream if the person is placed under physical or psychological stress. Such a release probably occurred in this case, increasing defendant's intoxication.

Dr. Berman viewed the videotaped reenactment of the crime.[9] He noticed certain things (e.g., a lack of normal emotional response) which indicated defendant was under the influence of PCP during the videotaping.[10] Dr. Berman thought he detected nystagmus—movement of the eyes characteristic of PCP intoxication—at two points on the videotape.

Dr. Forbes testified that defendant had suffered unusually severe physical abuse as a child. One of the punishments defendant's father inflicted was to lock defendant in a closet, making him kneel on rice. If his father caught him standing up, he would beat him. Dr. Forbes believed the instant offense was highly influenced by defendant's childhood punishment in closets. She opined that defendant acted in a dissociative state, increased by his use of PCP, when he became trapped in the closet. Defendant essentially perceived the victim as if she were his father. Defendant's act of strangling the victim also went back to his father strangling defendant as a child. In Dr. Forbes's opinion, defendant's ability to respond to the situation was severely impaired.

In rebuttal, Dr. Siegal, a pharmacologist, testified that the primary psychological symptom associated with PCP use is confusion about the world. Chronic PCP users, however, develop an ability to function relatively normally at dosages which would affect a first-time user. Chronic users typically have about 50 nanograms per milliliter of PCP in the blood and are not greatly affected by it. Because of the chronic user's tolerance to the psychological effects of PCP, intoxication does not correlate with blood level, as with alcohol, but rather with the user's behavior. Thus, if a person had 47

---

[9] Defendant voluntarily surrendered himself at approximately 2 p.m. on September 11, three days after the crime was committed. Defendant consented to be interviewed by detectives. During the interview, defendant admitted killing Martinez. Although the detectives intended to record the interview, the tape recorder was not properly connected and the initial interrogation was thus not preserved. The videotaped reenactment took place shortly after the initial interview on September 11.

[10] It was stipulated that a blood sample taken from defendant on September 11 contained 47 nanograms of PCP per milliliter.

nanograms of PCP per milliliter of blood but did not display symptoms of intoxication, the person is probably a chronic user and is probably not intoxicated.

In the videotaped reenactment, Dr. Siegal saw no symptoms of PCP intoxication in defendant's behavior. He also saw no indications of nystagmus, although there was at least one point on the videotape where it should have been observable if it were present. Defendant had no difficulty in coordination, he maintained eye contact with the sergeant, and he did not slur his speech. Defendant appeared to have a good memory of the events, including, for example, the ability to correct distance estimates. Defendant asked meaningful questions of the officers and was able to indicate when he did not understand something and ask for clarification.

Dr. Siegal concluded that at the time of the offense defendant was not extremely disfunctional and had the mental capacity for memory, thinking and perception.

Dr. Skidmore, a forensic psychologist, attacked Dr. Muir's opinion that defendant suffered from organic brain damage. She pointed out that the tests Dr. Muir used, projective personality tests, were inadequate to make an assessment of brain disfunction. Typically, comprehensive neuropsychological tests, aptitude assessments and objective personality tests should have been, but were not, performed. With regard to the tests which Dr. Muir did administer, defendant achieved his highest score on a section of the test on which brain damaged persons do not perform well.

Moreover, in Dr. Skidmore's opinion defendant's test scores did not support Dr. Muir's opinion that defendant could not think abstractly or plan. Although defendant's test scores indicated an inability to deal abstractly with language, they also indicated an above-average ability in nonverbal conceptualization. Defendant's mother had testified, in support of the accuracy of the psychological tests offered in mitigation, that defendant grew up with English as his primary language. However, Dr. Skidmore testified that the most usual interpretation of scores like defendant's, having significant differences between the verbal and nonverbal scores, is not that the person being tested is mentally impaired, but that the person is bilingual or grew up in a bilingual home. Defendant grew up in a bilingual home; he himself speaks both Spanish and English, and his father spoke almost no English. Thus, a "culture-fair" IQ test should also have been given.

Dr. Flanagan, a psychiatrist for the Department of Corrections, testified that he was often called by the San Bernardino County District Attorney to perform mental status evaluations of persons accused of a crime. On

September 15, 1981, he was called in to do a mental status evaluation of defendant. He interviewed defendant at the county jail in Ontario. In his opinion, defendant at that time was coherent, in contact with reality, and understood that he had been arrested for murder.

*Penalty Phase Contentions*

1. *Trial Court's Voir Dire Statement*

■ Before beginning each death qualification voir dire, the trial court made a statement to the following effect: "The Court is . . . required to ascertain if there is any prospective juror who entertains such a conscientious opinion regarding the death penalty that would preclude his finding the defendant guilty of murder in the first degree, if the evidence should justify such a finding and/or would preclude his finding of truthfulness as to one or all of the special circumstances alleged, if the evidence should justify such a finding or findings and/or if that juror, because of his conscientious objection to the death penalty, would under no circumstances vote for a verdict of death or the converse of that; that is, that we have any prospective juror who has such a conscientious opinion regarding the two possible verdicts that he would automatically, and in every case, vote for a verdict of death and under no circumstances vote for a verdict of life imprisonment without the possibility of parole . . . . [¶] The law never requires you to vote for the death penalty, only that you consider the death penalty if the facts warrant it. [¶] If you entertain any such conscientious opinions, the law provides that you will not be permitted or compelled to serve as a juror in this case. . . ."

Defendant contends that the court's statement informed reluctant potential jurors what to say to avoid service and informed potential jurors strongly favoring the death penalty what not to say in order to avoid disqualification. Defendant claims that the resulting jury was biased toward death.

Defendant's claim of juror bias must be rejected. It is unsupported by any evidence, and based on the untenable presumption that the potential jurors lied during the voir dire. In any event, the trial court's statement was an accurate and neutral reflection of the correct principles of law. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770].)

2. *New Penalty Phase Jury*

Before the beginning of the penalty phase, defendant requested the trial court to empanel a new jury for the penalty phase. We conclude defendant

has failed to demonstrate any good cause requiring a new jury at the penalty phase.

Section 190.4, subdivision (c) provides: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, *the same jury* shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. . . ." (Italics added.) The state has a legitimate interest in having a single jury try the issues of both guilt and penalty. (See *People* v. *Fields* (1983) 35 Cal.3d 329, 352-353 [197 Cal.Rptr. 803, 673 P.2d 680].)

 Defense counsel argued three matters had prejudiced the jury: (1) the additional proceedings to complete the guilt phase verdicts; (2) the receipt of improper evidence allegedly suggesting that defendant had sold stolen jewelry to a fence; and (3) the pathologist's allegedly "lurid speculation" that the victim had been sexually assaulted.

Defense counsel's first claim, that he sensed a "grim atmosphere" from the jury when it was recalled to consider the degree of the murder and that he believed the jury might blame him for being brought back early, amounted to nothing more than subjective projection. Indeed, the jury might well have realized that the prosecutor had the greatest interest in seeing to it that the jury was recalled to complete its verdict. There is no indication of any jury bias or hostility to the defense.

Nor was a new jury required on account of the second matter argued by defense counsel. In his opening statement the prosecutor stated he expected the evidence to show that defendant had sold Herman Ramirez the ring taken from the victim. Ramirez, a liquor store owner, testified that defendant had sold him a ring for $150. Ramirez further testified, however, that the photograph the prosecutor showed him did not depict the ring defendant had sold him. Accordingly, the trial court ruled the testimony irrelevant and instructed the jury to disregard it. Defense counsel's fear that the jury would believe that the ring defendant had actually sold was stolen and that Ramirez was a fence was based on pure speculation. Further, it presumed the jury would ignore the court's instructions to disregard the testimony.

 Defendant's third basis for requesting a new jury was the testimony of Dr. Root, the pathologist. Dr. Root testified the injuries to the victim's vaginal and anal area were most likely caused by insertion of a foreign object, such as a broom handle, but could have been caused by a kick or kicks. The trial court ultimately granted a judgment of acquittal pursuant to

section 1118.1 on counts III (penetration of the vagina with a foreign object) and IV (penetration of the anus with a foreign object).

Because the court granted a judgment of acquittal on counts III and IV, defendant argues these counts should not have been charged. Not so. Defendant was originally charged with murder, burglary, rape and sodomy. After the preliminary hearing, during which Dr. Root testified to the same effect as at trial, defendant was not held to answer on the sodomy charge. For trial, the People filed an information charging murder, burglary, rape by a foreign object and sodomy by a foreign object. The fact that defendant was not held to answer on a charge of forcible sodomy does not invalidate the prosecutor's discretionary decision to charge defendant at trial with sodomy by penetration with a foreign object. Dr. Root's testimony was consistent with such a charge and was admissible in the case on that charge.

Defendant appears to argue in addition that the judgment of acquittal on counts III and IV at the guilt phase somehow converted the evidence into improper penalty phase evidence, in violation of section 190.3, of other criminal activity as to which the defendant was acquitted. Not so.

Section 190.3 obviously was intended to preclude presentation at the penalty phase of criminal charges of which the defendant was acquitted in a *different* proceeding, not charges disposed of in the present prosecution. It is commonplace for a defendant in a capital case to be tried on multiple charges. The statutory preference that the same jury should consider both the guilt phase and the penalty phase obviously contemplates that the jury may have considered charges at the guilt phase of which the defendant was acquitted. The fact that a defendant was acquitted of some charges at the guilt phase thus does not constitute "good cause" to discharge the jury and empanel a new jury for the penalty phase.

3. *Testimony of Correctional Psychiatrist*

Defendant presented to the trial court a motion *in limine* to exclude from the penalty phase trial evidence of his statements to Dr. Flanagan, a prosecution psychiatrist, on the grounds his statements to Dr. Flanagan were obtained as a result of an unreasonable delay in his arraignment and in violation of his right to counsel. The trial court denied the motion.

Defendant voluntarily surrendered himself to sheriff's authorities at approximately 2 p.m. on Friday, September 11, 1981. Defendant was advised of his constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and talked to sheriff's officers about the offense. He was readvised of his rights later that day on

videotape immediately preceding the videotaped reenactment of the offense at the scene. After the videotaping, defendant was transported to a hospital where a blood sample was drawn, and he was booked into the county jail for the night. After his booking, defendant for the first time said he did not want to talk about the case any more. The next morning, however, Saturday, September 12, defendant initiated a contact with sheriff's officers. He was again *Mirandized* and agreed to talk about some rings that were missing from the victim.

On September 15, Tuesday, the district attorney told sheriff's officers he wanted Dr. Flanagan to talk to defendant. Sergeant O'Rourke contacted defendant at 11:15 a.m., introduced him to Dr. Flanagan and advised defendant once again of his *Miranda* rights. Defendant waived his rights and agreed to speak to Dr. Flanagan. Dr. Flanagan explained the purpose of the examination and reminded defendant his statements would be made available to the district attorney. Dr. Flanagan then performed a psychiatric examination of defendant.

The complaint against defendant was filed that same day, apparently after the examination by Dr. Flanagan. The prosecutor made the charging decision "shortly before the complaint was filed." Defendant was arraigned on the afternoon of the same day, September 15, 1981.

■ Defendant contended below and urges here his arraignment was unreasonably delayed to obtain the examination by Dr. Flanagan. Section 849 requires that a defendant arrested without a warrant be brought before a magistrate "without unnecessary delay."[11] Defendant was arraigned four days after his surrender to authorities, including a Saturday and Sunday. The time necessary for the charging authority "to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed" must be deemed reasonable. (See *People* v. *Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883].) This case involved potential charges of murder and special circumstances. There was valid reason at that time to believe that defendant might have been influenced to "cover up" the involvement of one of his brothers. In view of the complexity of the charging decisions involved, the delay was not unreasonable.

There is no evidence, and in fact Sergeant O'Rourke denied, that the arraignment was delayed for the purpose of obtaining the psychiatric inter-

---

[11] Section 849 is to be contrasted with section 825, which provides that a defendant arrested pursuant to a warrant must be arraigned "without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." The two-day limitation is not contained in section 849. On the other hand, before an arrest warrant is issued, the authorities will normally have already investigated and evaluated the case and have filed a complaint sufficient to support issuance of the warrant.

view. Even if it were, however, such an examination is within the permitted purpose of evaluating the evidence for the purpose of determining what charges should be filed. Defendant's mental state was obviously material to that purpose.

Defendant further argues the trial court improperly refused to permit defense counsel to inquire into the prosecutor's alleged improper motive for delay, because of its erroneous view that any delay within the two-day limit of section 825 must be considered reasonable per se. Not so. From the nature of the arguments of counsel concerning, e.g., the time necessary to prepare the case for filing, it is clear the trial court found any delay substantively reasonable.

Defendant also contends the prosecutor purposely delayed his arraignment so that he could be interviewed by Dr. Flanagan before counsel was appointed. ██ As a corollary, defendant urges this court to establish a new rule of law that the right to appointed counsel attaches at the prearraignment stage because the question whether to submit, prearraignment, to a psychiatric evaluation is so complex and subtle that no defendant can be expected to knowingly consent without advice of counsel. Defendant acknowledges the novelty of his request to establish a new right to counsel prearraignment and admits he did not raise the issue in the trial court, although he contends he was not required to do so because it would have been futile.

Defendant's claim must fail in any event. As we have already pointed out, defendant was repeatedly *Mirandized* and thus informed of his right to counsel and freely waived his rights before the psychiatric interview was conducted. Although defendant urges the decision whether to submit to such an interview is too complex for a defendant to make without advice of counsel, the issue is precisely the same as in an investigative interrogation: that defendant's statements may be used against him. A *Miranda* advisement is sufficient. (Cf. *People* v. *Polk* (1965) 63 Cal.2d 443, 449 [47 Cal.Rptr. 1, 406 P.2d 641].)

Defendant's reliance on *Estelle* v. *Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866] in support of his claimed right to counsel before submitting to the psychiatric examination is misplaced. In that case, the defendant was examined by a court-appointed psychiatrist, who testified at the penalty phase as to statements the defendant had made during the examination. Although the defendant in that case was represented by counsel, the psychiatrist had not advised defense counsel that the interview was to take place, nor was the defendant advised of his constitutional rights before the interview. By contrast, defendant here was not yet represented by

counsel, had numerous times knowingly waived the right to the appointment of counsel, and again was advised of and waived his constitutional rights, including the right to counsel, immediately before submitting to the interview.

In sum, there was no unreasonable delay, defendant was fully advised and freely waived his rights in submitting to the psychiatric interview, and his right to counsel was not violated.

### 4. *Introduction of Prior Felony Conviction*

■ Defendant next contends his representation at trial was incompetent because defense counsel asked the trial court, in the presence of the jury, to take judicial notice of defendant's prior felony conviction. To prevail on that claim defendant must demonstrate he was prejudiced by his attorney's failure to act as a reasonably diligent advocate (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) and that counsel's actions " 'cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People* v. *Lanphear* (1980) 26 Cal.3d 814, 828-829 [163 Cal.Rptr. 601, 608 P.2d 689].)

The prosecutor had indicated he did not plan to introduce the prior conviction, but defense counsel explained he intended to convey to the jury that defendant had been convicted of one, but only one, prior felony, possession of a quantity of amphetamines. (Defendant had pleaded guilty and was granted probation.)

Defense counsel obviously made a tactical decision to portray defendant as a person whose only prior conviction was for a relatively minor drug possession offense and, at the same time, bolster the evidence in mitigation that defendant had a serious and prolonged drug problem which contributed to his inability to control his conduct and which grew out of the terrible physical abuse he suffered as a child. While the tactic may have been somewhat novel, under the circumstances of the case, it can hardly be said to constitute incompetent representation.

### 5. *Standard of Proof of Mitigating Circumstances*

■ Defendant requested an instruction to the effect that a mitigating circumstance need not be proved beyond a reasonable doubt, but that the jury must find a mitigating circumstance to exist if there is "any substantial evidence" to support it. Defendant urges the court erred in refusing this instruction and in failing to instruct generally on the standard of proof applicable to circumstances in mitigation.

In particular, defendant contends that prior decisions, holding that such instructions should not be given because to do so would "erroneously limit the jury's absolute discretion in the selection of the penalty" (*People* v. *Brawley* (1969) 1 Cal.3d 277, 299 [82 Cal.Rptr. 161, 461 P.2d 361]), are no longer controlling after *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], which condemned standardless sentencing power in the determination of the death penalty.

We perceive no error. There is no reason to believe under the instructions in this case the jury was in any way led to believe it could consider mitigating circumstances "only if proven beyond a reasonable doubt." Moreover, the penalty determination under the 1978 death penalty law is not standardless. The jury's determination of the penalty is guided by consideration of the factors in aggravation and mitigation. Nonetheless, the jury is not limited in its consideration of any evidence in mitigation which could serve as a justification for imposition of a penalty less than death. (See *People* v. *Brown* (1985) 40 Cal.3d 512, at p. 541 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Indeed, defendant's profferred instruction, that a mitigating circumstance must be found if there is any substantial evidence to support it, might erroneously limit the jury's consideration of relevant mitigating evidence.

The jury here was instructed that the statutory circumstances in mitigation were merely "examples" of some of the factors the jury might consider in mitigation and that it should not limit its consideration to factors mentioned by the court, but it could consider "any other circumstances relating to the case or to [defendant] as reasons for not imposing the death sentence." The jury was also instructed that "any one" of the factors in mitigation could provide a sufficient basis for deciding that death was not the appropriate penalty. Finally, the jury was told it could consider pity, sympathy or mercy for defendant. We conclude the jury was instructed under proper standards with respect to its consideration of mitigating circumstances.

### 6. *Reasonable Doubt Instruction*

Defendant also urges the jury should have been instructed it must return a verdict of life without possibility of parole unless it were convinced beyond a reasonable doubt that aggravating circumstances outweighed the mitigating circumstances. We considered and rejected an identical contention in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777 [230 Cal.Rptr. 667, 726 P.2d 113]. (See also *People* v. *Frierson* (1979) 25 Cal.3d 142, 180 [158 Cal.Rptr. 281, 599 P.2d 587].)

### 7. *Brown Error*

█ Defendant claims the jury was erroneously instructed that it "shall" impose the death penalty if it found the aggravating circumstances outweighed the mitigating circumstances.

As we have held in *People* v. *Brown, supra,* 40 Cal.3d 512, because the "shall" language of CALJIC No. 8.84.2 has the potential to be misleading, the fundamental inquiry is whether the jury was misled as to the scope of its function in making the penalty determination. (*Brown, supra,* 40 Cal.3d 512, 544, fn. 17.)

In this case, the jury was not misled. As already noted (at p. 790, *ante*), the jury here was instructed that the circumstances in mitigation were simply "examples" of some of the factors the jury could consider as reasons for deciding not to impose the death penalty. The jury was instructed it should not limit its consideration of mitigating circumstances to the specific factors mentioned by the court, but it was entitled to consider "any other circumstances relating to the case or to [defendant] as reasons for not imposing the death sentence." The court also instructed the jury that "any one" of the mitigating circumstances would be "sufficient, standing alone" for the jury to decide "that death is not the appropriate punishment in this case." And, in addition, the jury was told it could consider pity, sympathy or mercy for defendant in deciding "the appropriate penalty." The instructions clearly advised the jury of the scope of its discretion in determining the appropriate penalty, including the full consideration of all evidence in mitigation.

Neither did the prosecutor's argument mislead the jury as to its role. Rather the prosecutor argued that death was "the appropriate sentence in this case." The prosecutor told the jurors they could assign whatever weight they deemed appropriate to the factors in mitigation. He emphasized the process was a balancing process, not a mechanical counting of the number of circumstances. He further acknowledged "there's nothing wrong with" consideration of pity, sympathy and mercy for defendant. The thrust of the prosecutor's argument was that the "weight" to be assigned to the aggravating factors and to the mitigating factors was such that death, rather than life imprisonment without the possibility of parole, was the appropriate penalty.

There was no *Brown* error.

8. *Premeditation and Deliberation as an Aggravating or Mitigating Circumstance*

The jury was instructed that "the fact, if true, that the murder was not premeditated and deliberate" could be considered in mitigation. The jury was also instructed on the definition of premeditation and deliberation. And, of course, the jury was told it could consider as a factor in aggravation "the circumstances of the crime of murder of which [defendant] has been convicted in the present proceeding."

■ Defendant contends the jury should have been given his requested instruction that as a matter of law the murder was not premeditated and deliberate, and that this was established as a factor in mitigation. Defendant points to the standards developed in *People* v. *Anderson* (1968) 70 Cal.2d 15, at pages 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], and contends that, as a matter of law, the murder was not premeditated and deliberate.

Defendant urges that the court's instructions both deprived him of an instruction on a mitigating factor (lack of premeditation and deliberation, as a matter of law), and erroneously permitted the jury to conclude that same factor might be aggravating instead (premeditation and deliberation as a "circumstance of the crime" of which defendant was convicted).

In *Anderson,* this court discussed the evidence necessary to support a verdict of first degree murder on a premeditation and deliberation theory. We found that such evidence is usually of three types; i.e., evidence of activity directed toward the killing ("planning" activity—type (1) evidence), evidence of the defendant's prior relationship to the victim which would supply a motive for killing (type (2) evidence), and evidence that the manner of killing indicates an intention to kill (type (3) evidence). We held that a jury finding of premeditation and deliberation "requires at least extremely strong evidence of (1) [planning,] or evidence of (2) [motive] in conjunction with either (1) [planning] or (3) [manner of killing manifesting intention to kill]." (*People* v. *Anderson, supra,* 70 Cal.2d 15, 27.)

Defendant's argument that none of these three types of evidence of premeditation and deliberation was present in the instant case is incorrect. Although there was no evidence of planning activity with respect to the killing, there was evidence of motive. The victim was defendant's neighbor and would easily have been able to recognize and identify defendant as the perpetrator of the burglary. In addition, the manner of the killing does furnish some indication of an intention to kill. Ligature strangulation is in its nature a deliberate act. In this case, the ligature was knotted twice and applied after the victim had already been rendered unconscious and unresis-

tant. Taking time to do this was inconsistent with defendant's stated objective, which was simply to escape. Although the quantum of *Anderson* "type" evidence presented might not have been overwhelming there was evidence from which premeditation and deliberation could rationally be inferred.

Moreover, even assuming defendant's requested instruction should have been given, he has demonstrated no prejudice. The jury was properly instructed that the absence of deliberation and premeditation was a circumstance in mitigation. It was *not* instructed, conversely, that a failure to find that the murder was not premeditated and deliberate could be considered a factor in aggravation. Although the court instructed that "[t]he circumstances of the crime" could be considered by the jury as either mitigating or aggravating, specific mention of premeditation and deliberation was included only among the circumstances in mitigation. It was conspicuously omitted from the factors in aggravation. In fact, the court enumerated only two additional specific circumstances the jury might consider in aggravation—the finding of the special circumstance, and defendant's prior felony conviction—but listed numerous specific factors which could be considered in mitigation, including "The fact, if true, that the murder was not premeditated and deliberate."

The instructions that "[t]he circumstances of the crime" could be considered either mitigating or aggravating were proper general statements of the law, and depended upon the effect of the facts the jury found. For example, evidence that defendant planned the burglary (to the extent of asking his brother to knock on the door and see if anyone was home), that defendant hid instead of escaping, that defendant did not leave after knocking Martinez unconscious but rather that he took the time to strangle her, knotting her belt twice around her neck, and that defendant completed his intent to steal by taking the victim's ring and other jewelry, tended to show violence and callousness, and certainly would constitute "circumstances of the case" the jury could consider in aggravation.

The refusal to give defendant's requested instruction was not error and could have resulted in no prejudice in any event.

9. *Jury Note-taking*

██ Defendant next contends the trial court committed prejudicial error in failing to give, sua sponte, a cautionary instruction to the jury about the dangers of note-taking. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-748 [205 Cal.Rptr. 810, 685 P.2d 1161].)

By statute (§ 1137), California law expressly permits jurors to take notes and consult them during deliberations. Although we suggested in *Whitt, supra,* 36 Cal.3d 724, that the "better practice" would be to advise the jury of some of the dangers of note-taking, we did not hold that such a cautionary instruction was required. (*People* v. *Silbertson* (1985) 41 Cal.3d 296, 303 [221 Cal.Rptr. 152, 709 P.2d 1321].) Moreover, defendant has suggested no possible prejudice—indeed, the record does not affirmatively demonstrate that any notes were taken. Thus "Whatever the import of *Whitt,* even if retroactively applied—this case was tried before *Whitt*—any error in failing to give the instruction in this case does not compel reversal of the judgment." (*People* v. *Leach* (1985) 41 Cal.3d 92, 107 [221 Cal.Rptr. 826, 710 P.2d 893].)

### 10. *Prosecutorial Misconduct*

Defendant assigns as error numerous instances of alleged prosecutorial misconduct during the closing penalty phase argument. In all but a few instances, defense counsel did not object or request a curative admonition from the court. (*People* v. *Green* (1980) 27 Cal.3d 1, 34-35 [164 Cal.Rptr. 1, 609 P.2d 468].) ■ Where the alleged misstatement could have been cured by a timely admonition but none was requested, there is no reversible error. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776].)

■ Defendant further asserts that defense counsel's failure to object constitutes ineffective assistance of counsel. Not so. Almost all of the prosecutor's remarks were within the range of permissible argument and were thus not objectionable. In addition, defense counsel successfully objected at other times when the prosecutor's remarks were improper. Defense counsel appears to have been an experienced, diligent and effective advocate. (See *People* v. *Pope, supra,* 23 Cal.3d 412, 425.) Defendant has failed to show that the failure to object " 'cannot be explained on the basis of any knowledgeable choice of tactics.' " (*People* v. *Lanphear, supra,* 26 Cal.3d 814, 828-829.) Defense counsel competently chose to rely on the court's instructions identifying the mitigating factors and his own arguments regarding the mitigating evidence rather than raising excessive objections or calling attention to the prosecutor's argument. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772-773 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1002-1003 [118 Cal.Rptr. 391].) It is not reasonably probable that any of the matters affected the penalty determination. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052].)

Specifically, defendant contends the following remarks constituted misconduct: During the closing penalty argument, the prosecutor suggested

that defendant hid in the closet "to lie in wait for the opportunity to do exactly what he did." Although, as defendant points out, the case was not tried on a lying-in-wait theory, the argument was to the effect that defendant's behavior—hiding in a closet—was inconsistent with his claim he wanted to escape and that he had strong psychological reasons to be fearful of closets. The argument was entirely proper.

The prosecutor characterized the victim as defenseless. This argument was not improper. Defendant physically overpowered the victim, a woman smaller than himself, struck her unconscious from behind, and strangled her after she was rendered unconscious and unresistant.

The prosecutor stated that it was "almost a form of torture" to kill by strangulation and that defendant's treatment of the victim's body was "torturous." The reference to torture amounted to no more than editorial comment on the manner of the killing: strangulation with a ligature knotted twice and tied so tight it had to be cut from the victim's neck, and the other serious bodily injuries the victim suffered before death. Moreover, it was harmless. The jury did not have before it, and therefore would not be confused by, any issue having to do with proof of torture for the purposes of establishing first degree murder or a special circumstance.

The prosecutor argued that the jury should give little weight to mercy for defendant because defendant had shown no mercy to the victim "when she was probably begging for her life." Defense counsel immediately objected on the basis there was no evidence the victim had "begged for her life." He pointed out that the victim was unconscious when she was strangled. The trial court sustained the objection. The promptly sustained objection adequately informed the jury that the prosecutor's argument in this regard was baseless and should be disregarded.

The prosecutor argued that two of defendant's brothers who had testified at trial were, like defendant, physically abused by their father when they were children, yet they "didn't become murderers." Defendant complains that the prosecutor made this argument contrary to the trial court's ruling that testimony on this subject would not be allowed. Defendant has mischaracterized the trial court's ruling. The prosecutor inquired of defendant's mother whether one of the brothers had ever been in trouble while he was in the Marine Corps. The trial court sustained defense counsel's objection because evidence that other siblings, who had also been mistreated by their father, had a criminal record, would be irrelevant.[12] However, the

---

[12] Defense counsel informed the court and the prosecutor in chambers that the brother about whom the inquiry was made had been arrested for armed robbery. He also represented

court considered the *absence* of a criminal record, despite the father's mistreatment, to be relevant. The prosecutor *thereupon withdrew* from further inquiry into the criminal records of defendant's siblings.

The statement that the two brothers who testified were not murderers was permissible in response to defendant's theory that the abuse of defendant when he was a child contributed to the killing. The evidence showed that the father had also brutally mistreated all defendant's siblings. Further, it was factually correct that neither of the two brothers the prosecutor named, both of whom had testified at trial, was a murderer.

The prosecutor argued that the jury should consider that the victim was defendant's neighbor and had recently given birth. Although these facts were not in themselves aggravating factors, they were "circumstances of the crime" which indicate defendant took advantage of the victim's vulnerability in deciding to undertake his criminal enterprise.

Defendant next complains of the prosecutor's argument that the instant killing was more aggravated than other felony murders because the killing was not accidental. The prosecutor argued that even an accidental felony murderer would be subject to the death penalty, but that the circumstances would not be so aggravating as in the instant case. Defendant contends this argument constituted misconduct because the prosecutor must have known that an accidental felony murder could not be subject to the death penalty. He cites *Enmund* v. *Florida, supra,* 458 U.S. 782. Where the defendant is the actual killer, however, *Enmund* suggests that a felony murderer may be constitutionally subject to the death penalty even where the killing is accidental. (See also, *People* v. *Anderson, supra,* 43 Cal.3d 1104, 1146-1147.) Moreover, this court did not issue its opinion in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], holding an intent to kill was required, until many months after the closing arguments in this case.

██ During closing argument the prosecutor stated the crime had a devastating effect on the victim's husband, who was suddenly left without a wife, the mother of his children. Defense counsel's objection was sustained. The prosecutor continued his argument, stating briefly that the victim had left a husband, a four-year-old son and a five-week-old daughter. Defendant urges, with reliance on *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], that this reference to the family, after the earlier objection had been sustained, was particularly reprehensible misconduct. It

---

that a third brother, who was not a witness in this proceeding, had suffered a murder conviction.

is true that the impact of the crime on the victim's family is not a "circumstance of the crime" which may be considered in aggravation. However, defendant's objection to this line of argument was immediately sustained by the court. The prosecutor's briefly mentioning thereafter that the victim was survived by her husband and two young children was factual, and not emotionally inflammatory. Reversal is not required on this account. (See *People* v. *Ghent, supra,* 43 Cal.3d 739, 771-772; *People* v. *Miranda* (1987) 44 Cal.3d 57, 112-113 [241 Cal.Rptr. 594, 744 P.2d 1127].)

■ Finally, defendant argues the prosecutor committed prejudicial misconduct when he stated that if defendant committed the crime because he could not control an unconscious impulse, that was "even more reason to not allow him to continue living in our society anywhere." The prosecutor's remark was improper. If defendant did not consciously choose to act as he did that would be a circumstance in mitigation, not in aggravation. Nevertheless, no objection was made. A timely admonition from the court could have corrected the effect of the remark. Defendant is therefore precluded from raising the point on appeal. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.)

Moreover, there is no reasonable possibility the statement affected the verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].) The instructions apprised the jurors that they could consider any factor in mitigation as a reason for not imposing the death penalty. The jury received extensive evidence on defendant's character and background. The prosecutor's argument, taken as a whole, was fully consistent with the jury's consideration of sympathy, mercy, or any circumstances which might mitigate the penalty. The misconduct, if any, was isolated, brief and harmless.

Defendant also urges that, when defense counsel failed to object to the misconduct, the trial court had a sua sponte duty to intervene and control the alleged misconduct. We rejected such a claim in *People* v. *Poggi* (1988) 45 Cal.3d 306, at pages 335-336 [246 Cal.Rptr. 886, 753 P.2d 1082]. We similarly reject defendant's claim here.

11. *Jury Inquiry re Executive Clemency*

The jury retired to deliberate on the penalty at 2:50 p.m. on March 7, 1983. After a little more than an hour of deliberations, the jury sent the following note to the trial court: "Is there any way at all that a parole could be granted. Please list the ways. A ruling on executive clemancy [*sic*]."

Defense counsel urged the court to tell the jury that " 'Life without parole means life without parole.' " The prosecutor asked the court not to

tell the jury anything, simply to not answer the question. At 9:40 the next morning, the trial court stated to the jury: "I cannot answer these questions, to do so would be placing evidence and instructions before you not authorized by law and which, therefore, should not affect your decision in any manner."

▇▇▇ Defendant contends the trial court's response was inadequate, and the court should have informed the jury that defendant could not be paroled, and that a sentence of life without the possibility of parole "means exactly what it says."

Defendant also relies upon this court's suggestion in *People v. Ramos, supra,* 37 Cal.3d 136 (*Ramos II*) that, if the jury raises the issue of the Governor's commutation power, "the matter . . . is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." (*Id.,* at p. 159, fn. 12.)

This court's suggestion in *Ramos II* that the matter might "best [be] handled" by a short statement that the commutation power applies to both sentences is not a mandatory rule. Although the trial court's response here did not inform the jury that the Governor's commutation power applies to both the sentences of death and life without possibility of parole, the court by its response did avoid jury speculation about the commutation power. (Cf. *People v. Caro* (1988) 46 Cal.3d 1035, 1064-1065 [251 Cal.Rptr. 757, 761 P.2d 680].) The court's statement thus fulfilled the fundamental function of informing the jury that speculation upon the commutation power was not to be considered in the jury's deliberations.

12. *Proportionality Review*

Defendant argues the death sentence in this case is excessive in comparison to other cases and urges that this court must undertake a comparative sentence review. ▇▇▇ It is now well settled that comparative sentence review is not required under the Eighth Amendment. (*Pulley v. Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]; *People v. Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Hamilton, supra,* 46 Cal.3d 123, 158; *People v. Rodriguez, supra,* 42 Cal.3d 730, 777-779.)

▇▇▇ Defendant also urges that his individual culpability did not warrant the death penalty, citing *People v. Dillon, supra,* 34 Cal.3d 441. He argues the sentence should be reduced to second degree murder. *Dillon*

involved a very immature 17-year-old with no prior criminal record. He engaged with companions in a foolish raid on a marijuana field which was guarded by an armed man. The defendant panicked and shot the guard after he heard shots and then saw the guard pointing a gun at him. Both the jury and the court appeared to view the sentence as excessive with respect to that defendant.

By contrast, defendant was 29 years old at the time of the offense in the instant case. He has a prior felony conviction. Although defendant's theory was that he "panicked" or was unaware of his actions, he strangled the victim after he had already rendered her unconscious, rather than simply escaping as he claims was his intent. Moreover, neither the jury nor the court expressed any reluctance to find first degree murder, find the special circumstance to be true or to sentence defendant to death. We are unable to conclude the sentence is disproportionate to defendant's individual culpability.

### 13. *Validity of Death Penalty Statute*

Defendant urges the 1978 death penalty statute is unconstitutional because it lacks certain procedural safeguards (i.e., (1) specific enumeration of which factors are aggravating and which are mitigating, (2) written jury findings regarding aggravating factors, (3) proof of aggravating factors beyond a reasonable doubt, (4) jury unanimity on aggravating factors, (5) comparative appellate review, and (6) proof beyond a reasonable doubt that death is appropriate). These contentions have been considered and rejected in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 777-779. (See also *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317, 318-319 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Frierson, supra,* 25 Cal.3d 142, 176-184, 195-196.)

### 14. *Modification of Penalty*

Defendant next contends the trial court failed to independently reweigh the evidence in its determination of the motion for modification of the penalty judgment pursuant to section 190.4, subdivision (e)[13] and that it also

---

[13] Section 190.4, subdivision (e) provides in pertinent part: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11[81]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

failed to adequately state its reasons for denying the application to modify. These contentions have merit.

Defense counsel filed with the court an application for modification of the verdict pursuant to section 190.4, subdivision (e) in which he relied solely, without enumeration, upon his statements during closing argument as to why the mitigating circumstances outweighed the aggravating circumstances in this case. He also filed a motion for new trial, raising the issues of the jury's failure to find the degree of the murder, empanelment of a new penalty phase jury, prejudice from a one-word outburst by the victim's husband during the prosecutor's closing argument, and several incidents of alleged prosecutorial misconduct.

The two motions were heard together. Defense counsel argued, "without going through ad nauseum all the stuff I put down in the written points and authorities" that it would be unfair to impose the death penalty on defendant, because of trial court errors, the outburst by the victim's husband, and the prosecutor's inflammatory argument. Defense counsel stated in closing: "This Court has heard my arguments ad nauseum as to why I don't think that the aggravating circumstances don't [*sic*] outweigh the mitigating circumstances. [¶] I'm not going to flip them on you again, but this Court has also said informally off the record that you don't think that Mr. Bonillas deserves the death penalty, and I don't either."

The prosecutor argued in response that the court had a duty to look at the evidence of the aggravating and mitigating circumstances to determine whether the jury's verdict was contrary to the law or the evidence. He urged there was "ample evidence that it was not contrary to the evidence as presented in the penalty phase on aggravation and mitigation."

The court then ruled: "I'm told I did state that I didn't think that the defendant deserved the death penalty. I think what I actually stated was that I probably wouldn't, if I had been handling the situation, I would not have given the death penalty.

"I'm not sure, but I think that is probably because of my objection, perhaps, to the death penalty itself, rather than to the law that *requires* the death penalty to be given under certain circumstances. (Italics added.)

"I've reviewed the briefs submitted this morning. Most of them bring up points that the Court has rendered prior decisions on during the course of the trial, during the course of the proceedings and summations.

"I don't believe the jury made any errors in law in arriving at the death penalty.

*"I think the aggravating circumstances were there, that they did exceed the mitigating circumstances.* (Italics added.)

*"I don't think I have any right in that situation to reverse the verdict of the jury,* and I'm not going to do so at this time. (Italics added.)

"So I'm going to confirm the verdict of the jury at this time . . . ."

 Defendant's contention that the trial court did not exercise its independent judgment in reweighing the evidence appears to have merit. The trial court's statement "I think the aggravating circumstances were there, that they did exceed the mitigating circumstances. [¶] I don't think I have any right in that situation to reverse the verdict of the jury . . ." can best be understood as meaning that since the jury's verdict was supported by substantial evidence, the court lacked authority (had no "right") to modify the penalty prescribed by the jury. But that is not the law. If, after independently reweighing and giving consideration to the evidence, the trial judge is of the view that "the jury's findings and verdicts . . . are contrary to . . . the evidence" *as reweighed by him,* he has full authority and the duty to modify the verdict of death returned by the jury. (§ 190.4 [see fn. 13, *ante*].)

 The trial court's statement of reasons here was also deficient. It was insufficiently specific, even considering the moving papers, to indicate which aggravating or mitigating circumstances the court considered or the relative importance given them by the court. Thus, the trial court's generalized statement not only failed to serve the statutory purpose of causing the judge to consider with particularity each of the circumstances, aggravating and mitigating, but also leaves the reviewing court unable to determine that he did.

Although the court's statements indicate its familiarity with the issues raised during trial, the court failed to specify "sufficient[ly] 'to assure thoughtful and effective appellate review . . .'" the reasons why it concluded the aggravating circumstances exceeded the mitigating circumstances. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 794.) Accordingly, the judgment of death will be vacated and the matter will be remanded to the trial court for a new hearing on the application for modification of the verdict.[14] (*Ibid.*)

---

[14] The trial judge herein was Fenton E. Jones. Judge Jones should rehear the motion personally; however, if he is unavailable, the motion may be heard before another judge of the same court. (*People* v. *Brown* (1988) 45 Cal.3d 1247, 1264, fn. 7 [248 Cal.Rptr. 817, 756 P.2d 204].)

### 15. *Sentence on Burglary Conviction*

Finally, defendant points out that, although the trial court stayed any sentence on the burglary conviction (§ 654), it neglected actually to impose any sentence on that count. In view of the necessity to remand the cause for a new hearing on the motion to modify the penalty, the cause will also be remanded for pronouncement of judgment on the burglary conviction.

### DISPOSITION

The judgment is affirmed in all respects except that the judgment of death is vacated and the cause is remanded to the trial court for prompt reconsideration of the automatic application for modification of the death verdict (§ 190.4, subd. (e)), and for pronouncement of judgment on the conviction of burglary. If the trial court, upon application of appropriate standards, denies the application for modification of the verdict, it shall reinstate the judgment of death. If it grants the application, it shall enter a judgment of life without possibility of parole. Any subsequent appeal shall be limited to issues related to the modification application or the sentence on the burglary count. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 794-795.)

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Eagleson, J., concurred.

**ARGUELLES, J.**\*—I agree with the majority opinion's affirmance of the guilt and penalty phase judgments, as well as its decision to vacate the judgment of death and remand this case to the trial court, both to permit reconsideration of the application for the modification of the death verdict, and for imposition of sentence on the burglary count. In particular, I concur in the majority's reasoning that Penal Code section 1157[1] does not compel this court, on the facts of this case, to reduce the degree of defendant's crime to second degree murder simply because the jury did not *initially* specify the degree of the crime.

I write separately, however, simply to suggest that the Legislature may wish to take a fresh look at the provisions of section 1157, particularly in view of the manner in which the section has been interpreted for several decades. From virtually the outset of the provision's enactment, many cases have construed section 1157 as prescribing an inflexible rule, which often requires a court to reduce the degree of a crime in the face of clear and

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] All further statutory references are to the Penal Code.

reliable evidence that the jury must have actually found the defendant guilty of the higher degree offense. Thus, for example, even where the jury's verdict sustaining an allegation that the defendant was armed with a deadly weapon necessarily demonstrated that it intended to convict the defendant of first rather than second degree robbery (see *People* v. *Doran* (1972) 24 Cal.App.3d 316, 321-322 [100 Cal.Rptr. 886]; *People* v. *De Arkland* (1968) 262 Cal.App.2d 802, 818-819 [69 Cal.Rptr. 144]),[2] this court, in *People* v. *Beamon* (1973) 8 Cal.3d 625, 629 [105 Cal.Rptr. 681, 504 P.2d 905], footnote 2, concluded that section 1157 prohibited a court from giving effect to that logical inference and disapproved the Court of Appeal decisions in *Doran, supra,* and *De Arkland, supra,* which had upheld first degree robbery convictions under such circumstances. In *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], this court similarly declined to find the jury impliedly decided the degree of the murder where it failed to expressly specify degree, even though it also sustained a robbery-murder special-circumstance allegation and was instructed not to address the special circumstance allegation unless it first found the defendant guilty of first degree murder. (*Id.* at pp. 379-383.)[3]

This rigid application of section 1157 is clearly contrary to our present approach in dealing with the somewhat analogous situation in which a trial court improperly fails to instruct the jury on a lesser included offense. In such cases, we have held that a judgment can nonetheless be affirmed so long as we can determine that "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another ground in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; see also *People* v. *Garrison* (1989) 47 Cal.3d 746, 789-791 [254 Cal.Rptr.

---

[2] Former section 211a stated in pertinent part: "All robbery which is perpetrated by torture or by a person being armed with a dangerous or deadly weapon, . . . is robbery in the first degree. All other kinds of robbery are of the second degree."

[3] That a literal interpretation of section 1157 often results in anomalous consequences is apparent from the reluctance expressed by the justices of our intermediate appellate courts in applying the rule. Thus, Justice McDaniel averred that "[u]nfortunately, on this point, form triumphs over substance, and the law is traduced." (*People* v. *Johns* (1983) 145 Cal.App.3d 281, 295 [193 Cal.Rptr. 182]; see also *People* v. *Williams* (1984) 157 Cal.App.3d 145, 153 [quoting *Johns* approvingly], 158 [Staniforth, Acting P. J., concurring "only under compulsion of Penal Code sections 1157 and 1192."] [203 Cal.Rptr. 562].) In another case applying the prevailing strict interpretation of section 1157, Justice Ashby opined that "[t]his is another case in which we are required to exalt form over substance." (*People* v. *Thomas* (1978) 84 Cal.App.3d 281, 285 [148 Cal.Rptr. 532] [Ashby, J., conc.].)

Finally, a recent case involving the application of section 1157 drew two concurring opinions; one by Presiding Justice Lillie concurring "under the compulsion of section 1157" (*Gray* v. *Superior Court* (1989) 209 Cal.App.3d 342, 346), and another by Justice Woods, urging that *McDonald, supra,* 37 Cal.3d 351, be overruled. (*Gray, supra,* at p. 346.)

257, 765 P.2d 419] [applying *Sedeno* analysis when trial court has failed to instruct on element of an offense].)

In light of *Sedeno, supra,* 10 Cal.3d 703, and its progeny, I think it is clear that this court would not interpret section 1157 in such a formalistic manner if we were approaching the issue today as a matter of first impression. We are not writing on a clean slate, however, because the judicial interpretation of section 1157 noted above has been in place for many years, and the Legislature has effectively acquiesced in that interpretation by its inaction. If the rigidity of section 1157 is to be modified, I believe at this point the initiative must appropriately come from the Legislature.

The unique confluence of factors in this case, including the fact that defense counsel fortuitously brought the jury's inadvertent omission to the attention of the trial court before the penalty trial began, convinces me that the majority is correct in concluding that section 1157 does not require a reversal in this case. In light of today's holding, however, we can be sure that, in the future, defense counsel will not act as the defense counsel did in this case. Because it appears at least questionable whether the settled interpretation of section 1157 truly reflects the Legislature's actual intent, I think it would be advisable for the Legislature to reexamine the current language and prevailing interpretation of section 1157 and to make any modification in the provision which it deems appropriate.

Eagleson, J., and Kaufman, J., concurred.