Filed 8/7/13  P. v. Santiago CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054312 |
| v. | (Super.Ct.No. SWF028233) |
| RICARDO SANTIAGO et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed in part and reversed in part.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and

Appellant Ricardo Santiago.

Robert Booher, under appointment by the Court of Appeal, for Defendant and

Appellant Andrew Rudy Salas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr., and

Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Andrew Rudy Salas, a Hemet Trece gang member, and another man stood outside a residence yelling for a man named "Psycho." Jane Doe[1] lived at the residence and advised Salas and the other man to leave. One of them told her to go inside her residence or she could get killed. A short time later, Doe heard a gunshot outside her window, and two Hispanic males were seen in the street. A neighbor identified the shooters as Salas and defendant Ricardo Santiago. Defendants were later found together several blocks from the residence. Santiago was in possession of a knife, but no gun was found.

Defendants were tried together. Salas was convicted of making criminal threats against Doe (the jury was hung on the charge against Santiago), and Santiago was convicted of possession of a concealed dirk or dagger. They were both acquitted of or the jury was hung on all of the charges stemming from the shooting. They both were convicted of the substantive crime of active participation in a criminal street gang and gang enhancements for their individual crimes.

Defendants now contend jointly and individually as follows:

1. Salas contends that insufficient evidence was presented in order to convict him of making criminal threats within the meaning of Penal Code section 422.[2]

---

[1] Doe asked that her name be withheld because she feared retaliation, and the court so ordered.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

2. Santiago, joined by Salas, contends there was insufficient evidence presented to support his conviction of the gang enhancement pursuant to section 186.22, subdivision (b)(1).

3. Santiago, joined by Salas, contends there was insufficient evidence presented to support his conviction of the substantive crime of active participation in a criminal street gang pursuant to section 186.22, subdivision (a).

4. Santiago, again joined by Salas, contends that the prosecutor committed multiple instances of prosecutorial misconduct.

5. Santiago, joined by Salas, contends that the trial court erred by refusing to respond to a question posed by the jury during deliberations pertaining to the elements of the active gang participation charge.

6. Santiago contends that his conviction for possession of a dirk or dagger must be reversed because the trial court accepted a partial verdict.

7. Salas, joined by Santiago, contends that his sentence on the substantive crime of active participation in a criminal street gang must be stayed pursuant to section 654.

We reverse the convictions for active participation in a criminal street gang as to both defendants. We otherwise affirm the judgment.

# I

## PROCEDURAL BACKGROUND

Santiago and Salas were both charged as follows: assault with a semiautomatic firearm in violation of section 245, subdivision (b) (count 1); making a criminal threat in violation of section 422 (count 2); willful discharge of a firearm in a grossly negligent manner in violation of section 246.3 (count 3); and the substantive crime of actively participating in a criminal street gang in violation of section 186.22, subdivision (a) (count 4). It was alleged as to counts 1 through 3 that the crimes were committed for the benefit of or at the direction of a criminal street gang. (§ 186.22, subd. (b)(1).) It was alleged as to count 1 that Santiago personally used a firearm within the meaning of section 12022.5, subdivision (a), and a principal armed allegation was alleged within the meaning of section 12022, subdivision (a)(1). Santiago was charged with carrying a dirk or dagger in violation of section 12020, subdivision (a)(4) (count 5), with the special allegation that he committed the crime for the benefit of or at the direction of a criminal street gang (§ 186.22, subd. (b)(1)). Salas was charged with having a suffered one prior serious or violent felony conviction. (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1).)

Santiago and Salas were tried together in front of one jury. The jury found Santiago guilty of count 5, possession of a dirk or dagger. After delivering this partial verdict, two jurors were removed due to time constraints, and the jury newly constituted with two alternate jurors rendered verdicts on the remaining charges. Santiago and Salas were found guilty of active participation in a criminal street gang (count 4). Salas was

4

found guilty of making a criminal threat (count 2), and the gang allegation for that count was found true. The gang allegation for possession of dirk or dagger by Santiago (count 5) was found true. Salas was found not guilty of assault with a firearm (count 1). The jury hung on counts 1, 2, and 3 as to Santiago and on count 3 for Salas, and the trial court declared a mistrial on these counts. Counts 1 and 3 were dismissed by the trial court in the interests of justice (§ 1385) for Santiago, as was count 3 for Salas. Count 2 for Santiago was dismissed after a plea bargain for charges in another case. Salas admitted that he had suffered one prior serious or violent felony conviction.

Santiago was sentenced to two years on count 5, plus an additional three years for the gang enhancement, for a total prison sentence of five years. Sentence on the substantive gang conviction was ordered to run concurrent to count 5.[3] Salas was sentenced to the three strikes sentence of four years on count 2, plus five years for the gang enhancement for that count, for a total prison sentence of nine years. The sentence for active participation in a gang was ordered to run concurrent to the imposed sentence.

---

[3] Santiago had credit for time served and was released.

5

II

FACTUAL BACKGROUND

A.      *People's Case-in-Chief*

      1.      *Detention of Santiago and Salas*

On March 19, 2009, Hemet Police Officer Elpidio Ybarra heard over the police radio a report of a shooting on Campus Way in Hemet and that two suspects (Hispanic males between 17 and 18 years old with shaved heads and baggy clothes) were at large.[4] About 30 minutes later, he saw Santiago and Salas walking down the street. They appeared to him to match the description of the suspects. When they observed Officer Ybarra, they turned and walked briskly in another direction. Officer Ybarra exited his vehicle and ordered them to the ground.

Hemet Police Officer Eric Goodwyn arrived after Officer Ybarra had Santiago and Salas detained. Officer Goodwyn searched Santiago and Salas. Santiago was wearing dark, baggy clothing. Officer Goodwyn found a fixed-blade knife hooked to the belt of Santiago's pants. He did not see it but felt it during a patdown search. It was seized.

---

[4]      Officer Ybarra was no longer with the police department at the time of trial. He had resigned because he violated provisions of the police policy manual. These violations involved refusing to answer questions during an internal investigation and making misleading statements to a supervisor.

### 2. *Eyewitness testimony*

#### a. *Jane Doe*

In the early evening prior to defendants being detained, on March 18, 2009, Doe was living at a residence on Campus Way in Hemet with her then-boyfriend, Jason Young.[5] Doe suffered from various developmental and mental disabilities, including attention deficit hyperactivity disorder and obsessive compulsive disorder. It affected her ability to communicate.

Doe and Young were getting ready to go to bed when she heard what sounded like rocks hitting the house (the first incident). Doe went outside and saw two Hispanic males who "looked young," with shaved heads, throwing rocks at her house yelling out for somebody named "Psycho." Doe told them that there was no one at the house by that name and that they needed to leave.

The men responded that they knew he was there. Doe again told them there was no one there by that name and that they needed to leave. She told them her son and grandmother lived in the house. At trial, Doe testified that at this point one of them then said to her, "You need to go back inside, or you're going to get killed" or "hurt." Doe went back inside her house "thinking it was people being stupid." No one ever touched her, and she was not afraid at that time.

---

[5] Doe had a prior conviction for misdemeanor embezzlement in 2006.

In court, Doe could not identify which of the defendants made the statement. She could only identify Salas in court as one of the men present during the first incident. She could not positively identify Santiago due to the passage of time.

As Doe got ready for bed, between 30 minutes and an hour later, she heard a "pop" and knew it was a gunshot (the second incident). It scared her. She immediately dialed 911. She did not see who fired the shot. Doe admitted that she could not say for sure if the people involved in the second incident were the same people who were involved in the first incident.

In the 911 call, Doe stated that some "Mexican kids claiming San Jacinto just tried to shoot my husband." Doe told the 911 operator that they had come by earlier looking for someone named "Psycho." They threw rocks at the window. They left and returned with guns. She indicated they had put bandanas over their faces. She later stated that they said, "San Jacinto mother fuckers." At one point during the call, someone in the background stated the noise was a firecracker and not a gun. Doe also stated on the call that when she told the men who were looking for Psycho that they had to leave, one of them responded, "I suggest you go back inside before I kill you."

Doe became scared when she heard the gunshot. When she heard the shot, she thought that the earlier threat was a threat on her life.

Doe was transported to an infield showup where Santiago and Salas were detained. Before going to the showup, Doe told the officer she needed her glasses, but she claimed he would not allow her to go back inside her house for the glasses. Two men

8

were sitting on the curb. She identified one of the persons (but she was not 100 percent sure), and it was not clear from her testimony whom she identified. She did not identify the second person. She blamed it on not having her glasses.

At first, Doe was certain in court that Salas was the person who threatened her. She admitted that the prosecutor showed her photographs of defendants prior to trial and was told they were on trial. Doe never saw the shooters. Later, Doe testified one of the men (she was not sure if it was Salas) said, "You better go back inside before you get killed." Doe said she had a hard time looking at Salas in court because, even if he did not make the threat, she felt to that day that he had threatened her. She was certain Salas was at the first incident.

Doe tried to go back to the police station to talk about not wearing her glasses at the infield showup. She wanted to clarify she was not certain of her identification. One of the officers said to her, "I don't need a lying bitch coming in here and telling me what." [*Sic.*] He told her to leave. For the first time at trial, she claimed she recognized the voice in the second incident as the same as the one threatening her earlier. She never heard anyone say Hemet Trece.

Doe had been extremely scared since this incident. A few weeks after this incident, someone yelled at her, "Snitches get stitches." Another time someone drove by and said to her, "Just because someone is yelling out 'San Ja' doesn't mean you have to put them away."

b.     *Young*

Around 11:00 p.m. Young was asleep in his bedroom when he heard a disturbance on the front porch.  He went to his window because he could see the porch from his bedroom. [6]  He observed Doe and two men.  He described them as younger Hispanic males, around 18 years old, wearing dark clothing.  Young told them to leave because Doe's son was there, and he said, "I don't need this here right now."  They walked away without incident.

About 30 minutes later, two men came to the house.  Young looked out his bedroom window.  They were dressed the same as the men who had been at the house earlier, but these men had bandanas covering their faces from the nose down.  One of the men was wearing a hat.  Young observed one of the men holding a semiautomatic firearm.  Young had no trouble seeing these two men.  Young then heard, "First Street motherfucker" and a gunshot.[7]

At trial, Young said for the first time that one of the men had on a shirt that had white lettering.  Also for the first time, Young said that one the men who first came to his house had the same shirt with the writing on it.

---

[6]     Young had prior convictions of second degree burglary in 2003, misdemeanor false statements to an officer in 2006, and third degree burglary in 2000.

[7]     Young had told officers prior to trial that he heard "San Jacinto First Street motherfuckers."  He could not specifically recall "San Jacinto" at trial.

Young and Doe called the police. Young was taken to the infield showup. He identified Santiago as holding the gun and was 100 percent certain he was the shooter in the second incident.[8] He could not identify Salas.

Young recalled that Santiago had a bandana partially covering his face at the infield showup. He admitted that all he saw of the shooting suspect was his eyes and nose. Young identified Santiago due to the writing on his shirt, his eyes, and his nose.

c. *Cleveland*

Kevin Cleveland lived next door to Doe and Young.[9] That night, he was on his porch smoking a cigarette. He observed Santiago and Salas "accost[]" Doe; he identified both defendants in court. Cleveland described them as pushing and shoving Doe.[10]

Cleveland thought that Doe and the defendants argued for two minutes. He went inside. A few seconds later, he heard a gunshot. He looked outside and saw Salas holding a semiautomatic firearm. Santiago had already run off. The police then arrived. However, at trial, he identified Santiago as the shooter. Cleveland found a nine-millimeter shell casing on the ground in the street. He stated that neither one of the men was wearing a bandana when the shooting occurred.

Cleveland initially described the suspects to police as one Hispanic male and one White male. Cleveland identified Santiago and Salas at the infield showup and was 99.9

---

**8**      The prosecutor pointed out Santiago to Cleveland prior to his identification.

**9**      Cleveland had a prior conviction for spousal battery in 2007.

**10**     The prosecutor had shown Cleveland photographs of Salas and Santiago prior to trial and he read the statement he gave to police.

11

percent certain at the time of the showup; he was 100 percent certain of his identification at the trial.

Officer Ybarra drove Cleveland to the infield showup and testified that Cleveland immediately identified Salas and Santiago.

### 3. *Investigation*

A jail phone call involving Salas was recorded. In the call, Salas is asked why he got "busted." He responded, "[F]or shooting and shit." The person responded, "You're dumb I told you that."

Santiago also made a jail call that was recorded on August 5, 2010. Santiago said, "'Because when you see . . . Mo, I go to the same court with him, my crimey.'"

Retired Hemet Police Officer Douglas Barrett responded to Campus Way around 11:43 p.m. Cleveland told him that he saw two males on the street arguing; he never mentioned Doe. He went inside his house and heard a single gunshot. Doe told Officer Barrett the men told her, "Go back inside or I'll kill you." Young said he was outside on his porch when two males approached. They yelled, "San Jacinto First Street motherfuckers." One of them pointed a gun at him, and he went inside. He then heard a single gunshot. Cleveland showed him the nine-millimeter shell casing in the street.

Officer Barrett took Doe to the infield showup. She identified Salas as being at her house. Doe never said anything to the officer about wanting her glasses. She said she was 100 percent sure of her identification. Doe did not tell him what part Salas played when he was at her house. Young identified Santiago and was sure of his

12

identification. He claimed that Santiago pointed a gun at him while he was on the porch. Cleveland never mentioned Santiago's shirt with lettering. A gun was never located. Gunshot residue tests were conducted on Salas and Santiago that night, but no gunshot residue was found on them.

### 4. *Gang evidence*

Hemet Police Corporal Takashi Nishida testified as a gang expert. He indicated that violence was a big factor in gangs, and instilling fear in the community was a sign of respect for the gang. The Hemet Trece gang is a rival of the San Ja First Street gang. The area where the shooting occurred was claimed by Hemet Trece.

San Ja First Street gang members always referred to themselves by "San Ja First Street" or San Ja; they did not use "San Jacinto." As of March 18, 2009, the primary activities of the Hemet Trece gang were murder, attempted murder, assault with a deadly weapon, firearms violations, burglary, drug sales, and vandalism. Other gang members had been convicted of assault with a deadly weapon and making criminal threats.

Salas had a Hemet tattoo. Corporal Nishida had personal contact with both Salas and Santiago. They both had field identification cards on file. According to the field identification cards, Santiago's gang moniker was Lonely or Lonely Boy. Santiago had identified himself as a Hemet Trece gang member. Santiago was in pictures with other Hemet Trece gang members and gang graffiti.

According to field identification cards, Salas used the gang moniker Moe. Salas had been a member of Hemet Trece since he was 14 years old. Salas later denied his

gang membership but recently had been found with a hat with "Moe" and the gang's name written on it. Salas had been with another Hemet Trece gang member two months prior to the instant shooting. Salas had a Hemet tattoo, which had been recently modified. A Hemet Trece gang member had been in the courtroom the prior day.

It was Corporal Nishida's opinion that on March 8, 2009, both Salas and Santiago were active Hemet Trece gang members. After being given a hypothetical about the shooting, he opined that it was done for the benefit of the gang and in association with the gang. It was possible they yelled out "San Jacinto" to start a fight with Psycho, who may have been a member. Campus Way was in Hemet Trece gang territory.

Corporal Nishida indicated that if the shooters were San Jacinto gang members, they would have yelled out San Ja, not San Jacinto First Street. Corporal Nishida indicated that a "crimey" was a partner in crime. He was unaware of any San Jacinto or Hemet Trece gang member named Psycho. The area were Santiago and Salas were detained was a 10 to 15 minute walk from the shooting site.

Corporal Nishida was given the hypothetical that two Hemet Trece gang members are walking the streets of Hemet, a territory claimed by Hemet Trece, and one of them has a concealed knife on his waistband. The knife is covered by a long baggy shirt. He was asked if the possession of the knife was done for the benefit of, at the direction of, or in association with the criminal street gang, Hemet Trece. Corporal Nishida said the association was found by the two gang members. The knife is possessed for defensive

14

and offensive reasons. As gang members, they are constantly being challenged by other gang members, and they carry the knife for protection.

Later, Corporal Nishida was asked how calling out the rival gang's name -- not in a threatening manner -- would benefit the gang. Corporal Nishida said it was not the "norm" but that Hemet Trece members would still brag about committing the crime, and others would find out they were involved by word of mouth. Corporal Nishida felt that the general public would only know that a gang committed the crime. It would still instill fear. He admitted it would bolster the reputation of the rival gang. Again Corporal Nishida indicated that the norm was for a gang to call out its own gang name.

B.    *Defense*

Santiago called Robert Watts, who was an investigator employed by the public defender's office. Watts spoke with Doe on August 25, 2009. She was in custody. Doe claimed that she thought she knew Salas from somewhere else, but she did not remember him being in front of her house that night. She told this to the police officer.

III

INSUFFICIENT EVIDENCE CRIMINAL THREATS

Salas contends that there was insufficient evidence presented to support his conviction for making criminal threats. He argues that the evidence was insufficient to find that the statement made to Doe was so unequivocal, unconditional, and immediate as to constitute a threat. Moreover, he insists that Doe did not express fear during the first incident and only became fearful when she heard gunshots outside her residence 30

15

minutes later. However, Salas was found not guilty of being involved in the second shooting. As such, the evidence does not support his conviction for making criminal threats. Finally, Salas argues he could not be convicted of aiding and abetting the criminal threat.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

For a conviction of making a criminal threat, the People must prove as follows: "(1) The defendant willfully threatened to commit a crime that will result in death or

16

great bodily injury to another person.  (2)  The defendant had the specific intent that the statement be taken as a threat.  (3)  The threat was on its face and under the circumstances "'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat.'"  (4)  The threat caused the victim "'to be in sustained fear for his or her own safety or for his or her immediate family's safety.'"  (5)  The victim's fear was reasonable under the circumstances.  [Citations.]"  (*People v. Jackson* (2009) 178 Cal.App.4th 590, 596.)  "'In enacting section 422 . . . , the Legislature declared that every person has the right to be protected from fear and intimidation.  This act was in response to the growing number and severity of threats against peaceful citizens.' [Citation.]" (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

Defendant initially contends that there was insufficient evidence that the statement to Doe on its face was so unequivocal, unconditional, immediate, and specific as to convey to her a gravity of purpose and an immediate prospect of execution of the threat. Here, Doe said on the 911 call that the persons during the first incident had told her, "I suggest you go back inside before I kill you."  Doe told Officer Barrett that one of them threatened her to go back inside or "I'll kill you."  At trial, she stated the statement to her was that, "You need to go back inside, or you're going to get killed" or "hurt."

Doe also testified, "I'm like, in my head, I just said, 'whatever,' because people are stupid and they say stupid things."  The prosecutor then asked if she was not sure if they said "killed" or "hurt."  Doe responded, "It's been two years.  I know either way that

17

they were threatening me in some form and fashion. I don't remember if it was killed or hurt verbally, but I know it was a verbal threat."

"A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.) The defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety of his or her immediate family. (*People v. Thornton* (1992) 3 Cal.App.4th 419, 423 [Fourth Dist., Div. Two], rejected on other grounds by *People v. Hudson* (1992) 5 Cal.App.4th 131, 143, fn. 5.)

The statement standing alone expressed to Doe that she was going to get hurt or killed if she did not go inside and constituted a threat of great bodily injury or death. Although Salas argues that it could be a warning to her, the evidence supports that it was a threat. Based on either version of the threat, Doe could have reasonably been placed in the requisite state of sustained fear for her safety. The fact that she lived in a neighborhood where she was used to threats, or statements like this, does not impact the unequivocal nature of the threat. A reasonable person would fear for his or her own safety.

Further, the evidence established that, based on the surrounding circumstances, Doe did have sustained fear based on the statement. Although the fear was not

18

immediate, such immediacy was not required. Doe stated, "I'm used to idle threats. People say things out of anger or just trying to make themselves look bigger in front of someone else or whatever the case may be. But when you follow through with it in any means, it actually makes you stop and think, okay. What are they capable of, and how true to their word are they going to act?" The prosecutor then asked, "So once that shot was fired is when you became afraid of that; correct?" She responded, "Yes. Very much so." The prosecutor then asked her how afraid of the threat she was after that shot was fired. She responded, "The same amount I am today. I'm still terrified to walk into Hemet without looking over my shoulder."

To establish the "sustained fear" element, "the statute . . . requires proof of a mental element in the victim." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) The threat must "be such as to cause a reasonable person to be in *sustained fear* for his personal safety. . . . The phrase to 'cause[] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1139-1140.) "[I]t is clear a jury can properly consider a later action taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed. . . . The point is that all of the circumstances can and should be considered in determining whether a terrorist threat has been made." (*People v. Solis, supra,* 90 Cal.App.4th at p. 1014.)

19

"For instance, in *People v. Martinez* [(1997)] 53 Cal.App.4th 1212, the defendant claimed the language of his threat was vague and did not specifically convey a threat of great bodily injury or death. The appellate court conceded his threat may not have, by itself, conveyed a threat to commit great bodily injury or death but held that the trier of fact could consider all of the surrounding circumstances in deciding whether a terrorist threat had been made. In that case, the defendant set fire to a building where the victim worked a day after the defendant had made the threat. The court held the jury could properly consider that fact. It reasoned: 'Defendant's activities after the threat give meaning to the words and imply that he meant serious business when he made the threat.' [Citation.]" (*People v. Solis, supra,* 90 Cal.App.4th at p. 1013.)

This case is similar to *People v. Mendoza* (1997) 59 Cal.App.4th 1333, superseded by statute on other grounds as noted in *People v. Franz* (2001) 88 Cal.App.4th 1426. In *Mendoza* , the victim testified against the defendant's brother at a preliminary hearing. Defendant went to the victim's house after the testimony and told the victim that she had "'fucked up his brother's testimony'" and that he was going to talk to "'some guys from Happy Town,'" a gang to which both defendant and his brother belonged. (*Mendoza*, at p. 1337.) The victim knew defendant and his brother because she had been an associate in the gang. (*Id.* at p. 1341.) The victim did not initially take the words as a threat. However, about 20 to 30 minutes later, she heard a horn honking outside her home and saw defendant's friend sitting across the street in his car. (*Id.* at p. 1338.) It was at this point that the victim became "afraid for her life" and called the police. (*Ibid.*) On appeal,

20

the appellate court explained that while the defendant's "words were ambiguous, did not mention a particular criminal act or give other particulars, a rational juror could have found -- based on all the surrounding circumstances -- [defendant]'s words were sufficiently unequivocal, unconditional, immediate and specific to convey to [the victim] a gravity of purpose and immediate prospect of death or serious bodily injury." (*Id.* at p. 1342.)

Salas argues that "appellant's conviction for criminal threats cannot stand because the victim's fear did not arise from appellant's actions." However, this ignores that Salas either stated or aided and abetted in a statement that he was going to kill her if she did not go inside. The jury could reasonably conclude the statement was that she was going to get killed by standing up to Salas. This was supported by the evidence.

Moreover, this statement was stronger than that in *Mendoza*. Although Doe claimed she was not frightened at the time this statement was made, she later became afraid when she thought that Salas or the person he had previously been with were shooting at her house. Despite the fact that Santiago and Salas were not convicted beyond a reasonable doubt of the shooting, it was Doe's subjective belief that they were following through on their threat that caused her fear. We see no reason to distinguish this case from *Mendoza*. Even assuming that Salas was not involved in the shooting, the fact that he made or aided and abetted the threatening statement, and that Doe finally realized the gravity of the statement based on her house being the subject of gunshots, supports his conviction of making criminal threats. As we have found, the statement was

21

unequivocal.  Even if we conclude that Santiago and Salas were not involved in the shooting, this unrelated event only made Doe realize her fear when she should have been fearful when the statement was made.

Here, after the statement was made to her, Doe heard a gunshot.  In her mind, that person shooting was Salas or the person with Salas.  Although Salas was not convicted of the subsequent shooting, it certainly could be considered a circumstance surrounding the statement that shows it was unequivocal, unconditional, immediate, and specific and showing that Doe sustained fear from the statement.

Salas also contends that even if the statement was unequivocal, unconditional, immediate, and specific and Doe was in sustained fear, he could not be found guilty on an aiding and abetting theory.  In closing argument, the prosecutor argued that they could convict on an aiding and abetting theory because there was no testimony as to who threatened Doe.  The jury was instructed on aiding and abetting.

In order to convict a person on a theory that he aided and abetted a crime, there must be proof that "an aider and abettor with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense."  (*People v. Beeman* (1984) 35 Cal.3d 547, 560) "Among the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5, fn. omitted.)  Whether a person has aided and

abetted in the commission of a crime ordinarily is a question of fact, and all conflicts in the evidence and reasonable inferences are resolved in favor of the judgment. (*Ibid*.)

Here, it was undisputed that Salas was present when the threatening statement was made. Salas was with another Hispanic male, possibly Santiago, throwing rocks at Doe's house and looking for someone named "Psycho." Doe came outside and told them that Psycho did not live there and that they had to leave. They told her they did not believe her and refused to leave. It was at this point that either Salas, Santiago, or some other person said that she would be killed or they would kill her. Young got involved and told them to leave, and they complied. Salas was a short time later, only several blocks from the location, with Santiago.

The jury here could reasonably conclude that if Salas did not make the statement, he aided and abetted the speaker. Salas remained with the person throughout the incident, despite being told by Doe to leave. He did nothing to clarify the statement to Doe and only walked away when Young told them to leave. Salas remained close to the area where the incident occurred and was with Santiago. Although the jury could not reach a decision as to whether Santiago committed a criminal threat, there was some evidence he was present during the first incident. Cleveland identified Santiago as being at the scene. Even if it was not Santiago, the evidence was sufficient for the jury to find that Salas aided and abetted the criminal threat.

## IV

## INSUFFICIENT EVIDENCE OF GANG ENHANCEMENT

## (SECTION 186.22, SUBDIVISION (B)(1))

Santiago contends that the evidence was insufficient to support his conviction of the gang allegation pursuant to section 186.22, subdivision (b)(1). Here, Santiago's conviction for the gang enhancement was based on his conviction for possession of a dirk or dagger. Salas joined in Santiago's opening brief. However, in his request, Salas provided no argument as to reversal of his section 186.22, subdivision (b)(1) enhancement on his criminal threat conviction, and the enhancement on the dirk or dagger charge does not apply to him. We will not make the argument for him and will only address whether the evidence of the gang enhancement was sufficient to uphold the gang enhancement on the possession of a dirk or dagger charge against Santiago.

We have already set forth the standard of review for sufficiency of the evidence claims. To prove a gang enhancement allegation under section 186.22, subdivision (b)(1), the People must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

"In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the

24

criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period.  [Citation]."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, italics omitted.)  Santiago only disputes that he committed the crime for the benefit of and at the direction of the Hemet Trece gang.

To meet the first prong, the crime must be gang related.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  A crime is not gang related simply because it is committed by gang members.  (*Ibid*.)  However, where an expert opines that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness[, this] can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subdivision ](b)(1)."  (*Id.* at p. 63.)

As to the second prong of the enhancement, "specific intent to *benefit the* gang is not required.  What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'"  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [Fourth Dist., Div. Two].)  "It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. [Citation.]"  (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196.)  An expert cannot testify to the specific intent of the defendant on trial.  (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 658.)

In the recent California Supreme Court case, *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), the court distinguished the enhancement from the substantive gang crime embodied in section 186.22, subdivision (a), which will be discussed, *post*. "Section 186.22[, subdivision ](a) and section 186.22[, subdivision ](b)(1) strike at different things. The enhancement under section 186.22[, subdivision ](b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.] However, '[n]ot every crime committed by gang members is related to a gang.' [Citation.] As such, with section 186.22[, subdivision ](a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang related. [Citation.]" (*Rodriguez,* at p. 1138.)

It further held, "A lone gang member who commits a felony will not go unpunished; he or she will be convicted of the underlying felony. Further, such a gang member would not be protected from having that felony enhanced by section 186.22[, subdivision ](b)(1), which applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' Because the gang enhancement under section 186.22(b)(1) requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang, these requirements provide a nexus to gang activity

26

sufficient to alleviate due process concerns. [Citation.]" (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139.)

Here, Santiago was in Hemet Trece gang territory walking the streets with fellow gang member, Salas. He was in possession of knife that qualified as a dirk or dagger. Corporal Nishida testified that gang members in their own gang territory get challenged by other gang members, and knives are carried for offensive and defensive reasons. He testified that the primary activities by the gang included assault with a deadly weapon. Santiago and Salas were active gang members. This evidence established that the possession of the dirk or dagger was gang related and that it was possessed to promote or benefit the gang.

Santiago relies on *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*) to support his claim that this evidence was insufficient to uphold the gang enhancement for his possession of a dirk or dagger. In *Ramon,* the defendant was stopped while driving a stolen vehicle and had an unregistered firearm in his possession. (*Id.* at p. 847.) At trial, the prosecution's gang expert testified that the location at which Ramon and his passenger (a fellow gang member) were stopped was in the territory of the Colonia Bakers criminal street gang and that the territory was controlled through violence and intimidation. The primary activities of the gang were identified as sales and possession of narcotics, theft, extortion, burglaries, robberies, car theft, and victim and witness intimidation. (*Ibid*.) The expert stated that car theft was related to the crimes committed by the gang because by driving a stolen truck within the gang's territory, the member

27

could commit numerous crimes, then dispose of the vehicle and have no ties to it or the crime committed in it. The expert further testified that the unregistered gun and stolen vehicle could be used to spread fear and intimidation, which benefitted the gang. Moreover, the stolen vehicle and unregistered firearm were tools the gang needed to commit other crimes to further the gang. (*Id.* at pp. 847-848.)

On appeal, the *Ramon* court found that the expert relied on the belief the pair were members of the Colonia Bakers criminal street gang and the fact they were stopped in territory claimed by the Colonia Bakers. (*Ramon, supra,* 175 Cal.App.4th at p. 849.) The appellate court concluded: "The People's expert simply informed the jury of how he felt the case should be resolved. This was an improper opinion and could not provide substantial evidence to support the jury's finding. There were no facts from which the expert could discern whether Ramon and [his passenger] were acting on their own behalf the night they were arrested or were acting on behalf of the Colonia Bakers. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation. Speculation is not substantial evidence. [Citation.]" (*Id.* at p. 851.)

Santiago also relies upon *In re Frank S., supra,* 141 Cal.App.4th 1192. In *Frank S.*, a minor was found to be in possession of a knife, a small amount of methamphetamine, and a red bandana. He claimed he possessed the knife in order to protect himself from rival gang members. (*Id*. at p. 1195.) The appellate court found that evidence insufficient to warrant the conclusion the minor had the specific intent to

28

promote, further, or assist in criminal conduct by gang members. (*Id*. at p. 1196.) It found that the prosecution failed to provide any evidence that the minor was in gang territory, had gang members with him, or had any reason to use the knife in a gang-related offense. (*Id*. at p. 1199.)

Here, unlike *Frank S.*, Santiago was in gang territory when he was stopped, and he was with another Hemet Trece gang member. Further, although it appears the facts in *Ramon* are similar to this case, there are some differences. In *Ramon,* the expert relied almost exclusively on the fact that the defendant and his passenger were gang members and in gang territory. Here, Corporal Nishida provided testimony that possession of the knife was both for defensive and offensive reasons that would benefit the Hemet Trece gang. In addition, he testified that the primary activities of the gang included assault with a deadly weapon. This evidence tied Santiago's possession of the knife to the gang's primary crimes. Corporal Nishida explained that crimes of violence were important to the gang's reputation in the community. Unlike in *Ramon*, Corporal Nishida did not testify as to Santiago's specific intent but, rather, how the possession of a knife in gang territory by an active gang member benefits the gang. Moreover, *Ramon* was criticized in *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, footnote 7, that the evidence did establish the enhancement.

The evidence here was sufficient to support Santiago's conviction for the gang enhancement.

# V

## INSUFFICIENT EVIDENCE OF SUBSTANTIVE CRIME OF ACTIVE PARTICIPATION IN A GANG (SECTION 186.22, SUBDVISION (A))

Both Salas and Santiago contend there was insufficient evidence presented to convict them of count 4, active participation in a street terrorism gang within the meaning of section 186.22, subdivision (a). Santiago claims that his possession of the knife -- the only crime of which he was convicted -- did not support the enhancement. Santiago was not convicted of the criminal threat charge so the first incident involving the criminal threat could not be considered to support this enhancement for either Santiago or Salas.

The standard of review for sufficiency claims has been stated, *ante*. Section 186.22, subdivision (a) defines the crime as follows: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

"The substantive offense defined in section 186.22[, subdivision ](a) has three elements. Active participation in a criminal street gang, in the sense of participation that is more than nominal or passive, is the first element of the substantive offense defined in section 186.22[, subdivision ](a). The second element is 'knowledge that [the gang's] members engage in or have engaged in a pattern of criminal gang activity,' and the third

30

element is that the person 'willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' [Citation.]" (*People v. Lamas* (2007) 42 Cal.4th 516, 523.)

The California Supreme Court has held that the third element of the offense is not satisfied when a gang member commits a felony while acting alone. (*People v. Rodriguez, supra,* 55 Cal.4th 1125.) The word "members," as the Supreme Court explained, "is a plural noun." (*Id.* at p. 1132.) "Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22[, subdivision ] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid.*) The felonious criminal conduct referred to in the statute must be committed "'by members of that gang.'" (*Id.* at p. 1131.)

Here, there is no evidence that Salas was aware of the knife possessed by Santiago. With the jury being hung on the criminal-threat charge and the charges stemming from the shooting, the only crime of which Santiago was convicted was possession of the dirk or dagger. There is absolutely no evidence that Salas participated in that crime. As indicated in *Rodriguez,* "section 186.22[, subdivision ](a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." (*Rodriguez, supra,* 55 Cal.4th at p. 1139.) Santiago's possession of the knife, based on the evidence presented, showed

that he acted alone in perpetrating this felony. Officer Goodwyn only found the knife when he performed a patdown search. Although Santiago possessed the knife to promote and benefit the Hemet Trece gang, he never used it in Salas's presence. Santiago was punished for such possession by the gang enhancement. As such, neither Salas nor Santiago could be found guilty of active participation in a gang pursuant to section 186.22, subdivision (a).[11]

VI

PROSECUTORIAL MISCONDUCT

Santiago contends, presumably jointed by Salas, that the prosecutor committed misconduct on numerous occasions throughout the trial.

A.    *Standard of Review*

"'The standards governing review of [prosecutorial] misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." [Citation.] "In order to preserve a claim of misconduct, a defendant must make a timely

---

[11]    Since we reverse the active participation charge against Salas and Santiago, we need not address the claim in Salas's supplemental brief, with which Santiago has joined, that the sentence on the charge should have been stayed pursuant to section 654.

objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.]' [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 920.) In assessing prejudice, we "'do not lightly infer'" the jury drew the most damaging meaning from the prosecutor's statements. (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

B.    *Analysis*

Santiago pointed to several instances in his opening brief of misconduct that occurred in the trial court. These included failure to disclose evidence, discovery violations, Corporal Nishida's testimony regarding calling out a rival gang name, vouching for witnesses, improper questioning, misstating the evidence, tainting the witnesses, and misstating the law. We have reviewed these claims and the record supporting these claims. Most of the claims went to prejudice on the active participation in a gang crime and the shooting. However, since we have reversed defendants' convictions on the active participation offense on the ground of insufficiency of the evidence and the jury was hung on the shooting offenses, we need not address these issues and do not find prosecutorial misconduct. The only issue we find pertinent here -- to Santiago's conviction of possession of a dirk or dagger or Salas's conviction of

33

making criminal threats -- is the disparagement of defendants by the prosecutor during closing argument.**12**

During rebuttal argument, the prosecutor responded to argument by both counsel that Cleveland was excited to find the shell casing. The prosecutor stated, "And for a member of our community to be excited and happy that he might have helped solve a crime when violence is overrun, Hemet is not what it used to be. Happy we might put these scumbags in jail."

The prosecutor closed by saying, "Now you have all the tools you need to do the right thing, the right thing for our community. To hold these scumbag gangsters accountable for polluting our neighborhoods." There was no objection.

The People argue the argument was forfeited by counsel's failure to contemporaneously object and request a jury admonition. We agree and find that no prosecutorial misconduct can be shown due to the failure to object. (*People v. Clark* (2011) 52 Cal.4th 856, 960; *People v. Bonilla* (2007) 41 Cal.4th 313, 336.) However, since Santiago also argues that if he waived the claim because of his counsel's failure to object to the instance of alleged misconduct, he received ineffective assistance of counsel, we consider whether they were prejudiced by the comments.

---

**12** Santiago refers to a misstatement of the law regarding *Ramon, supra,* 175 Cal.App.4th 843. However, this argument went to the gang participation charge and not the enhancement.

34

We do not find prejudice. The evidence that Santiago possessed a dirk or dagger was overwhelming and undisputed. Salas provides no argument regarding the prosecutorial misconduct and how it prejudiced his conviction of committing criminal threats. The fact that the jury was told that Santiago and Salas were gang members who needed to be convicted did not so infect the trial as to make the resulting conviction a denial of due process. (*People v. Gonzales, supra,* 51 Cal.4th at p. 920.) We find no prejudicial prosecutorial misconduct.

## VII

## JURY QUESTION

Santiago, joined by Salas, contends the trial court erred by failing to respond to a question from the jury. Prior to the discharge of the two jurors, the jurors asked a second question as follows: "Does each el[e]ment of Count 4 (1, 2, 3 (a-b)) as relates to pgs 23-27 need to be satisfied for a guilty verdict to be entered[?]" According to the clerk's transcript, the response was "on the record." At that point, two of the jurors were removed due to other commitments and were replaced by two alternate jurors. There was no further discussion of the jury's question on the record. Since we have reversed the convictions for this count (active participation in a gang) for both Santiago and Salas, we need not address this issue.

35

VIII

PARTIAL VERDICT

Santiago contends that the trial court erred by accepting a partial verdict on count 5, his conviction for possessing a dirk or dagger.

A.     *Additional Factual Background*

Before dismissing the two jurors to be replaced by the alternates, the jury foreperson acknowledged that they had reached a verdict on one of the counts.  The trial court felt that it could take the guilty verdict prior to dismissing the two jurors.  The jury found Santiago guilty of possession of a dirk or dagger within the meaning of section 12020, subdivision (a).  The jurors were asked if this was their verdict, and all of the jurors answered in the affirmative.  All parties declined to have the jury polled.  The two jurors were replaced with the alternate jurors, and the entire jury was instructed to start deliberations anew.

B.     *Analysis*

Section 1164, subdivision (a) provides as follows:  "When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict.  If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall, subject to subdivision (b), be discharged from the case."  Subdivision (b) provides as follows:  "No jury shall be discharged until the court has verified on the record that the jury has either

36

reached a verdict or has formally declared its inability to reach a verdict on all issues before it, including, but not limit to, the degree of the crime or crimes charged, and the truth of any alleged prior conviction whether in the same proceeding or in a bifurcated proceeding."

"An essential element of [the] constitutional right [to trial by jury is] a unanimous verdict by 12 jurors. [Citation.] For unanimity to be found, '[t]he jurors must appear in court and be asked "whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same." [Citation.]' [Citation.]" (*People v. Garcia* (2012) 204 Cal.App.4th 542, 549.) The verdict is complete when it has been rendered in compliance with section 1164; it is ""received and read by the clerk, acknowledged by the jury, and recorded . . . ."" (*People v. Bonillas* (1989) 48 Cal.3d 757, 770.)

"[W]hen the court is going to discharge a deliberating juror and replace that juror with an alternate, the court should determine whether any verdicts have been reached *before* discharging the juror. In such a case, the jury may render a partial verdict, all 12 jurors can then affirm the verdict(s), and the verdict(s) may be recorded pursuant to section 1164." (*People v. Garcia, supra,* 204 Cal.App.4th at p. 552; see also *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1485 [trial court did not err in receiving partial verdict before replacing juror].) "The juror may then be discharged, an alternate seated to replace the juror, and the newly constituted jury instructed to begin its deliberations anew on any remaining charges and allegations." (*Garcia,* at p. 553.)

The trial court followed this approved procedure.  All 12 jurors were in court when the verdict was read, all of the jury agreed it was their verdict, and all parties declined to have them polled.  There was no error in taking the partial verdict.

IX

DISPOSITION

We reverse as to both defendants their convictions for violating section 186.22, subdivision (a).  We remand to the superior court in order for it to modify the judgment by striking the sentence on those convictions.  The superior court shall also modify the abstract of judgment and forward the modified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

MILLER
J.